578 F.2d 1197
 3 Media L. Rep. 2490
 Frank COLLIN and the National Socialist Party of America,
Plaintiffs-Appellees,
v.
Albert SMITH, President of the Village of Skokie, Illinois,
John N. Matzer, Jr., Village Manager of the Village of
Skokie, Illinois, Harvey Schwartz, Corporation Counsel of
the Village of Skokie, Illinois and the Village of Skokie,
Illinois, a Municipal Corporation, Defendants-Appellants.
 Nos. 78-1381, 78-1385.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 14, 1978.
Decided May 22, 1978.
 
 David Goldberger, Chicago, Ill., for plaintiffs-appellees.
 Harvey Schwartz and Gilbert Gordon, Skokie, Ill., for defendants-appellants.
 Before PELL, SPRECHER, and WOOD, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 Plaintiff-appellee, the National Socialist Party of America (NSPA) is a political group described by its leader, plaintiff-appellee Frank Collin, as a Nazi party. Among NSPA's more controversial and generally unacceptable beliefs are that black persons are biologically inferior to white persons, and should be expatriated to Africa as soon as possible; that American Jews have "inordinate . . . political and financial power" in the world and are "in the forefront of the international Communist revolution." NSPA members affect a uniform reminiscent of those worn by members of the German Nazi Party during the Third Reich,[1] and display a swastika thereon and on a red, white, and black flag they frequently carry.
 
 
 2
 The Village of Skokie, Illinois, a defendant-appellant, is a suburb north of Chicago. It has a large Jewish population,[2] including as many as several thousand survivors of the Nazi holocaust in Europe before and during World War II. Other defendants-appellants are Village officials.
 
 
 3
 When Collin and NSPA announced plans to march in front of the Village Hall in Skokie on May 1, 1977, Village officials responded by obtaining in state court a preliminary injunction against the demonstration. After state courts refused to stay the injunction pending appeal, the United States Supreme Court ordered a stay, National Socialist Party of America v. Village of Skokie, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977). The injunction was subsequently reversed first in part, Village of Skokie v. National Socialist Party of America, 51 Ill.App.3d 279, 366 N.E.2d 347 (1977), and then in its entirety, Id., 69 Ill.2d 605, 14 Ill.Dec. 890, 373 N.E.2d 21 (1978). On May 2, 1977, the Village enacted three ordinances to prohibit demonstrations such as the one Collin and NSPA had threatened.[3] This lawsuit seeks declaratory and injunctive relief against enforcement of the ordinances.
 
 
 4
 Village Ordinance No. 77-5-N-994 (hereinafter designated, for convenience of reference, as 994) is a comprehensive permit system for all parades or public assemblies of more than 50 persons.[4] It requires permit applicants to obtain $300,000 in public liability insurance and $50,000 in property damage insurance. Id., §§ 27-54, 27-56(j). One of the prerequisites for a permit is a finding by the appropriate official(s) that the assembly
 
 
 5
 will not portray criminality, depravity or lack of virtue in, or incite violence, hatred, abuse or hostility toward a person or group of persons by reason of reference to religious, racial, ethnic, national or regional affiliation.
 
 
 6
 Id., § 27-56(c). Another is a finding that the permit activity will not be conducted "for an unlawful purpose," Id., § 27-56(i). None of this ordinance applies to activities of the Village itself or of a governmental agency, Id., § 27-51, and any provision of the ordinance may be waived by unanimous consent of the Board of Trustees of the Village, Id., § 27-64. To parade or assemble without a permit is a crime, punishable by fines from $5 to $500. Id., § 27-65.
 
 
 7
 Village Ordinance No. 77-5-N-995 (995) prohibits
 
 
 8
 (t)he dissemination of any materials within the Village of Skokie which promotes and incites hatred against persons by reason of their race, national origin, or religion, and is intended to do so
 
 
 9
 Id., § 28-43.1. "Dissemination of materials" includespublication or display or distribution of posters, signs, handbills, or writings and public display of markings and clothing of symbolic significance.
 
 
 10
 Id., § 28-43.2. Violation is a crime punishable by fine of up to $500, or imprisonment of up to six months. Id., § 28.43.4. Village Ordinance No. 77-5-N-996 (996) prohibits public demonstrations by members of political parties while wearing "military-style" uniforms, § 28.42.1, and violation is punishable as in 995.
 
 
 11
 Collin and NSPA applied for a permit to march on July 4, 1977, which was denied on the ground the application disclosed an intention to violate 996. The Village apparently applies 994 § 27-56(i) so that an intention to violate 995 or 996 establishes an "unlawful purpose" for the march or assembly. The permit application stated that the march would last about a half hour, and would involve 30 to 50 demonstrators wearing uniforms including swastikas and carrying a party banner with a swastika and placards with statements thereon such as "White Free Speech," "Free Speech for the White Man," and "Free Speech for White America." A single file sidewalk march that would not disrupt traffic was proposed, without speeches or the distribution of handbills or literature.[5] Counsel for the Village advises us that the Village does not maintain that Collin and NSPA will behave other than as described in the permit application(s).
 
 
 12
 The district court, after considering memoranda, exhibits, depositions, and live testimony, issued a comprehensive and thorough opinion granting relief to Collin and NSPA. The insurance requirements of 994 were invalidated as insuperable obstacles to free speech in Skokie, and §§ 27-56(c) & (i) (the latter when used to deny permits on the basis of anticipated violations of 995 or 996) were adjudged impermissible prior restraints. Ordinance 995 was determined to be fatally vague and overbroad, and 996 was invalidated as overbroad and patently unjustified.
 
 
 13
 On its appeal, the Village concedes the invalidity of the insurance requirements as applied to these plaintiffs and of the uniform prohibition of 996.
 
 I.
 
 14
 The conflict underlying this litigation has commanded substantial public attention, and engendered considerable and understandable emotion. We would hopefully surprise no one by confessing personal views that NSPA's beliefs and goals are repugnant to the core values held generally by residents of this country, and, indeed, to much of what we cherish in civilization. As judges sworn to defend the Constitution, however, we cannot decide this or any case on that basis. Ideological tyranny, no matter how worthy its motivation, is forbidden as much to appointed judges as to elected legislators.
 
 
 15
 The record in this case contains the testimony of a survivor of the Nazi holocaust in Europe. Shortly before oral argument in this case, a lengthy and highly publicized citizenship revocation trial of an alleged Nazi war criminal was held in a federal court in Chicago, and in the week immediately after argument here, a four-part "docudrama" on the holocaust was nationally televised and widely observed. We cannot then be unmindful of the horrors associated with the Nazi regime of the Third Reich, with which to some real and apparently intentional degree appellees associate themselves.[6] Nor does the record allow us to ignore the certainty that appellees know full well that, in light of their views and the historical associations they would bring with them to Skokie, many people would find their demonstration extremely mentally and emotionally disturbing, or the suspicion that such a result may be relished by appellees.
 
 
 16
 But our task here is to decide whether the First Amendment protects the activity in which appellees wish to engage, not to render moral judgment on their views or tactics. No authorities need be cited to establish the proposition, which the Village does not dispute, that First Amendment rights are truly precious and fundamental to our national life. Nor is this truth without relevance to the saddening historical images this case inevitably arouses. It is, after all, in part the fact that our constitutional system protects minorities unpopular at a particular time or place from governmental harassment and intimidation, that distinguishes life in this country from life under the Third Reich.
 
 
 17
 Before undertaking specific analysis of the clash between the Village ordinances and appellees' desires to demonstrate in Skokie, it will be helpful to establish some general principles of pertinence to the decision required of us. Putting to one side for the moment the question of whether the content of appellees' views and symbols makes a constitutional difference here, we find we are unable to deny that the activities in which the appellees wish to engage are within the ambit of the First Amendment.
 
 
 18
 These activities involve the "cognate rights" of free speech and free assembly. See Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945). "(T)he wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 505, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Standing alone, at least, it is "closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment."[7] Id. at 505-06, 89 S.Ct. at 736. The same thing can be said of NSPA's intended display of a party flag, See Stromberg v. California,283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and of the messages intended for the placards party members would carry. See, e. g., Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Likewise, although marching, parading, and picketing, because they involve conduct implicating significant interests in maintaining public order, are less protected than pure speech, Shuttlesworth v. Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 554-55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), they are nonetheless subject to significant First Amendment protection. Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Shuttlesworth, supra,394 U.S. at 152, 89 S.Ct. 935; Cox, supra, 379 U.S. at 545-46, 85 S.Ct. 453. Indeed, an orderly and peaceful demonstration, with placards, in the vicinity of a seat of government, is "an exercise of (the) basic constitutional rights of (speech, assembly, and petition) in their most pristine and classic form." Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).
 
 
 19
 No doubt, the Nazi demonstration could be subjected to reasonable regulation of its time, place, and manner. Police Department of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Grayned, supra, 408 U.S. at 115-16, 92 S.Ct. 2294; Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox, supra, 379 U.S. at 554-55, 85 S.Ct. 453. Although much of the permit system of 994 is of that nature, the provisions attacked here are not. No objection is raised by the Village, in ordinances or in their proofs and arguments in this case, to the suggested time, place, or manner of the demonstration, except the general assertion that in the place of Skokie, in these times, Given the content of appellees' views and symbols, the demonstration and its symbols and speech should be prohibited.[8] Because the ordinances turn on the content of the demonstration, they are necessarily not time, place, or manner regulations. Mosley, supra, 408 U.S. at 99, 92 S.Ct. 2286; Konigsberg v. State Bar of California, 366 U.S. 36, 50-51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).
 
 
 20
 Legislating against the content of First Amendment activity, however, launches the government on a slippery and precarious path:
 
 
 21
 (A)bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. Cohen v. California, 403 U.S. 15, 24 (91 S.Ct. 1780, 29 L.Ed.2d 284) (1971); Street v. New York, 394 U.S. 576 (89 S.Ct. 1354, 22 L.Ed.2d 572) (1969); New York Times Co. v. Sullivan, 376 U.S. 254, 269-70 (84 S.Ct. 710, 11 L.Ed.2d 686) (1964), and cases cited; NAACP v. Button, 371 U.S. 415, 445, (83 S.Ct. 328, 9 L.Ed.2d 405) (1963); Wood v. Georgia, 370 U.S. 375, 388-389 (82 S.Ct. 1364, 8 L.Ed.2d 569) (1962); Terminiello v. Chicago, 337 U.S. 1, 4 (69 S.Ct. 894, 93 L.Ed. 1131) (1949); De Jonge v. Oregon, 299 U.S. 353, 365 (57 S.Ct. 255, 81 L.Ed. 278) (1937). To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, supra, at 270, 84 S.Ct. (710) at 721.
 
 
 22
 Mosley, supra, 408 U.S. at 95-96, 92 S.Ct. at 2290.
 
 
 23
 This is not to say, of course, that content legislation is Per se invalid. Chief Justice Burger concurred in Mosley, at 102-03, 92 S.Ct. 42, just to point out the established exceptions to such a rule, namely obscenity, fighting words, and, as limited by constitutional requirements, libel. Likewise, in very narrow circumstances, a government may proscribe content on the basis of imminent danger of a grave substantive evil. Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). But analysis of content restrictions must begin with a healthy respect for the truth that they are the most direct threat to the vitality of First Amendment rights.
 
 II.
 
 24
 We first consider ordinance 995, prohibiting the dissemination of materials which would promote hatred towards persons on the basis of their heritage. The Village would apparently apply this provision to NSPA's display of swastikas, their uniforms, and, perhaps, to the content of their placards.[9]
 
 
 25
 The ordinance cannot be sustained on the basis of some of the more obvious exceptions to the rule against content control. While some would no doubt be willing to label appellees' views and symbols obscene, the constitutional rule that obscenity is unprotected applies only to material with erotic content. Cohen v. California, supra, 403 U.S. at 20, 91 S.Ct. 1780. Furthermore, although the Village introduced evidence in the district court tending to prove that some individuals, at least, might have difficulty restraining their reactions to the Nazi demonstration, the Village tells us that it does not rely on a fear of responsive violence to justify the ordinance, and does not even suggest that there will be any physical violence if the march is held.[10] This confession takes this case out of the scope of Brandenburg v. Ohio, supra, and Feiner v. New York, 340 U.S. 315, 321, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (intentional "incitement to riot" may be prohibited). The Village does not argue otherwise.
 
 
 26
 The concession also eliminates any argument based on the fighting words doctrine of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The Court in Chaplinsky affirmed a conviction under a statute that, as authoritatively construed, applied only to words with a direct tendency to cause violence by the persons to whom, individually, the words were addressed. Id. at 573, 62 S.Ct. 766. A conviction for less than words that at least tend to incite an immediate breach of the peace cannot be justified under Chaplinsky.[11] Gooding v. Wilson, 405 U.S. 518, 524-27, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). The Illinois Supreme Court, in Village of Skokie v. National Socialist Party of America, supra, has squarely ruled that responsive violence fears and the fighting words doctrine could not support the prohibition of appellees' demonstration. Although that decision was in a prior restraint context, and we are here considering only the post facto criminal aspects of 995, the decision does buttress our conclusion that Chaplinsky does not cover this case. Again, the Village does not seriously contest this point.
 
 
 27
 Four basic arguments are advanced by the Village to justify the content restrictions of 995. First, it is said that the content criminalized by 995 is "totally lacking in social content," and that it consists of "false statements of fact" in which there is "no constitutional value." Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). We disagree that, if applied to the proposed demonstration, the ordinance can be said to be limited to "statements of fact," false or otherwise. No handbills are to be distributed; no speeches are planned. To the degree that the symbols in question can be said to assert anything specific, it must be the Nazi ideology, which cannot be treated as a mere false "fact."
 
 We may agree with the district court that
 
 28
 if any philosophy should be regarded as completely unacceptable to civilized society, that of plaintiffs, who, while disavowing on the witness stand any advocacy of genocide, have nevertheless deliberately identified themselves with a regime whose record of brutality and barbarism is unmatched in modern history, would be a good place to start.
 
 
 29
 But there can be no legitimate start down such a road.
 
 
 30
 Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.
 
 
 31
 Gertz, supra at 339-40, 94 S.Ct. at 3007. (footnote omitted). In the words of Justice Jackson, "every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." Thomas v. Collins, supra, 323 U.S. at 545, 65 S.Ct. at 329 (concurring opinion). The asserted falseness of Nazi dogma, and, indeed, its general repudiation, simply do not justify its suppression.
 
 
 32
 The Village's second argument, and the one on which principal reliance is placed, centers on Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952). There a conviction was upheld under a statute prohibiting, in language substantially (and perhaps not unintentionally) similar[12] to that used in the ordinance here, the dissemination of materials promoting racial or religious hatred. The closely-divided Court stated that the criminal punishment of libel of an Individual raised no constitutional problems, relying on Chaplinsky v. New Hampshire, supra, 315 U.S. at 571-72, 62 S.Ct. 766:
 
 
 33
 There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words . . . . (S)uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.
 
 
 34
 Quoted at 343 U.S. 255-57, 72 S.Ct. at 730. That being so, the Court reasoned that the state could constitutionally extend the prohibition to utterances aimed at groups.
 
 
 35
 In our opinion Beauharnais does not support ordinance 995, for two independent reasons. First, the rationale of that decision turns quite plainly on the strong tendency of the prohibited utterances to cause violence and disorder. The Illinois Supreme Court had so limited the statute's application, as the United States Supreme Court noted. Id. at 254, 72 S.Ct. 725. The latter Court also pointed out that the tendency to induce breach of the peace was the traditional justification for the criminal libel laws which had always been thought to be immune from the First Amendment. Id. After stating the issue (whether Illinois could extend criminal libel to groups) the Court turned to Illinois' history of racial strife "and its frequent obligato of extreme racial and religious propaganda," Id. at 261, 72 S.Ct. at 733, and concluded that the Illinois legislature could reasonably connect the strife and the propaganda and criminalize the latter to prevent the former. Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), was quoted, at 261, 60 S.Ct. at 906:
 
 
 36
 The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit Would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, ([13] is emphasized by events familiar to all. These and other transgressions of (the limits to First Amendment rights) the States appropriately may punish. (Emphasis added.)
 
 
 37
 It may be questioned, after cases such as Cohen v. California, supra; Gooding v. Wilson, supra ; and Brandenburg v. Ohio, supra, whether the Tendency to induce violence approach sanctioned implicitly in Beauharnais would pass constitutional muster today. Assuming that it would, however, it does not support ordinance 995, because the Village, as we have indicated, does not assert appellees' possible violence, an audience's possible responsive violence, or possible violence against third parties by those incited by appellees, as justifications for 995. Ordinance 995 would apparently be applied in the absence of any such threat. The rationale of Beauharnais, then, simply does not apply here.
 
 
 38
 Further, when considering the application of Beauharnais to the present litigation, we cannot be unmindful of the "package" aspects of the ordinances and that the "insulting" words are to be made public only after a 30-day permit application waiting period. Violence occurring under such a circumstance would have such indicia of premeditation as to seem inconsistent with calling into play any remaining vitality of the Beauharnais rationale.
 
 
 39
 The Village asserts that Beauharnais implicitly sanctions prohibiting the use of First Amendment rights to invoke racial or religious hatred Even without reference to fears of violence.[14] In the light of our discussion of Beauharnais ' premises, we do not find the case susceptible of this interpretation.[15] Even if it were, however, we agree with the district court that decisions in the quarter-century since Beauharnais have abrogated the Chaplinsky dictum, made one of the premises of Beauharnais, that the punishment of libel "has never been thought to raise any Constitutional problem." New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 135 (1964) (criminal libel); and Gertz v. Robert Welch, Inc., supra, are indisputable evidence that libel does indeed now raise serious and knotty First Amendment problems, sufficient as a matter of constitutional law to require the substantial rewriting of both criminal and civil state libel laws.
 
 
 40
 The Eighth Circuit, Tollett v. United States, 485 F.2d 1087, 1094 n. 14 (8th Cir. 1973), and Judge Wright of the District of Columbia Circuit, Anti-Defamation League of B'nai B'rith v. Federal Communications Commission, 131 U.S.App.D.C. 146, 403 F.2d 169, 174 n. 5 (1968) (concurring opinion), Cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969), have expressed doubt, which we share, that Beauharnais remains good law at all after the constitutional libel cases. Cf. Vanasco v. Schwartz, 401 F.Supp. 87, 94 (E.D.N.Y.1975), Aff'd, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976). We agree at least this far: If 995 is to be sustained, it must be done on the basis of the Village's interest asserted, and the conduct to which 995 applies, not on the basis of blind obeisance to uncertain implications from an opinion issued years before the Supreme Court itself rewrote the rules.
 
 
 41
 The Village's third argument is that it has a policy of fair housing, which the dissemination of racially defamatory material could undercut. We reject this argument without extended discussion. That the effective exercise of First Amendment rights may undercut a given government's policy on some issue is, indeed, one of the purposes of those rights. No distinction is constitutionally admissible that turns on the intrinsic justice of the particular policy in issue.
 
 
 42
 The Village's fourth argument is that the Nazi march, involving as it does the display of uniforms and swastikas, will create a substantive evil that it has a right to prohibit: the infliction of psychic trauma on resident holocaust survivors and other Jewish residents.[16] The Village points out that Illinois recognizes the "new tort" of intentional infliction of severe emotional distress, See Public Finance Corporation v. Davis, 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976); and Knierim v. Izzo, 22 Ill.2d 73, 174 N.E.2d 157 (1961), the coverage of which may well include personally directed racial slurs, See Contreras v. Crown Zellerbach Corporation, 88 Wash.2d 735, 565 P.2d 1173 (1977). Assuming that specific individuals could proceed in tort under this theory to recover damages provably occasioned by the proposed march, and that a First Amendment defense would not bar the action,[17] it is nonetheless quite a different matter to criminalize protected First Amendment conduct in anticipation of such results.
 
 
 43
 It would be grossly insensitive to deny, as we do not, that the proposed demonstration would seriously disturb, emotionally and mentally, at least some, and probably many of the Village's residents. The problem with engrafting an exception on the First Amendment for such situations is that they are indistinguishable in principle from speech that "invite(s) dispute . . .. induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). Yet these are among the "high purposes" of the First Amendment. Id. It is perfectly clear that a state many not "make criminal the peaceful expression of unpopular views." Edwards v. South Carolina, supra, 372 U.S. at 237, 83 S.Ct. at 684. Likewise, "mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms." Coates v. City of Cincinnati, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971). Where, as here, a crime is made of a silent march, attended only by symbols and not by extrinsic conduct offensive in itself, we think the words of the Court in Street v. New York, supra, 394 U.S. at 592, 89 S.Ct. at 1366, are very much on point:
 
 
 44
 (A)ny shock effect . . . must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. (Citations omitted.)
 
 
 45
 It is said that the proposed march is not speech, or even "speech plus," but rather an invasion, intensely menacing no matter how peacefully conducted. The Village's expert psychiatric witness, in fact, testified that the effect of the march would be much the same regardless of whether uniforms and swastikas were displayed, due to the intrusion of self-proclaimed Nazis into what he characterized as predominately Jewish "turf." There is room under the First Amendment for the government to protect targeted listeners from offensive speech, but only when the speaker intrudes on the privacy of the home, or a captive audience cannot practically avoid exposure. Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); And see Rowan v. Post Office Department, supra; Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed. 770 (1974). The Supreme Court has
 
 
 46
 consistently stressed that "we are often 'captives' outside the sanctuary of the home and subject to objectionable speech." (Citing Rowan, supra (397 U.S.) at 738 (90 S.Ct. 1484.) The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections. (Emphasis added.)
 
 
 47
 Cohen v. California, supra, 403 U.S. at 21, 91 S.Ct. at 1786.
 
 
 48
 This case does not involve intrusion into people's homes. There Need be no captive audience, as Village residents may, if they wish, simply avoid the Village Hall for thirty minutes on a Sunday afternoon,[18] which no doubt would be their normal course of conduct on a day when the Village Hall was not open in the regular course of business. Absent such intrusion or captivity, there is no justifiable substantial privacy interest to save 995 from constitutional infirmity, when it attempts, by fiat, to declare the entire Village, at all times, a privacy zone that may be sanitized from the offensiveness of Nazi ideology and symbols.
 
 
 49
 We conclude that 995 may not be applied to criminalize the conduct of the proposed demonstration. Because it is susceptible to such an application, we also conclude that it suffers from substantial overbreadth, even if some of the purposes 995 is said to serve might constitutionally be protectible by an appropriate and narrower ordinance. See Cox v. Louisiana, supra. The latter conclusion is also supported by the fact that the ordinance could conceivably be applied to criminalize dissemination of The Merchant of Venice or a vigorous discussion of the merits of reverse racial discrimination in Skokie. Although there is reason to think, as the district court concluded, that the ordinance is fatally vague as well, because it turns in part on subjective reactions to prohibited conduct, See Coates v. City of Cincinnati, supra ; and Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), we do not deem it necessary to rest our decision on that ground.
 
 III.
 
 50
 Our decision that 995 cannot constitutionally be applied to the proposed march necessarily means that a permit for the march may not be denied on the basis of anticipated violations thereof. See 994 § 27-56(i), quoted above. We turn to the question of whether the similar provision built into 994, by § 27-56(c), can be the basis of a permit denial.
 
 
 51
 The answer really follows with even greater strength from our conclusion on 995. Because 994 § 27-56(c) gives to Village "officials the power to deny use of a forum in advance of actual expression," Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975), it is a prior restraint, Id., which thus "comes to this Court with a 'heavy presumption' against its constitutional validity." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971).
 
 
 52
 The presumption against prior restraints is heavier and the degree of protection broader than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech After they break the law than to throttle them and all others beforehand.
 
 
 53
 Southeastern Promotions, supra, 420 U.S. at 558-59, 95 S.Ct. at 1246. The slightly more specific language of § 27-56(c) than that which 995 contains might cut against finding the former provision unconstitutionally vague, but there is otherwise no meaningful difference between the two provisions except the element of prior restraint. The requested parade permit cannot be denied on the basis of § 27-56(c).
 
 IV.
 
 54
 As we have indicated, the Village has conceded that 996 is unconstitutional. We agree, and affirm the district court in this respect as well.
 
 
 55
 The Village has also conceded that the insurance requirements of 994 §§ 27-54, 27-56(j) Cannot be applied to appellees' proposed demonstration.[19] The district court, however, found the requirements to be insuperable obstacles to free speech in Skokie, subject to discretionary waiver explicitly or by Village cosponsorship,[20] see Shuttlesworth v. Birmingham, supra; Police Department of Chicago v. Mosley, supra, 408 U.S. at 97, 92 S.Ct. 42, and thus unconstitutional On its face. Appellees urge us to affirm the district court's conclusion, and not to accept the more limited concession offered by the Village.
 
 
 56
 Appellees proved in the district court that they could not obtain the requisite insurance, and also that, in the opinion of their expert, insurance would typically be unavailable to those very controversial groups as to which the Village's interest in having insurance would presumably be the greatest. This expert testimony comports with the teachings of common sense, and, when combined with the discretionary waiver feature in 994, might well justify our reaching the broader conclusion appellees urge on us.
 
 
 57
 On the other hand, we do not need to determine now that no insurance requirement could be imposed in any circumstances, which would be a close question, in our view. The present case does not require us to reach out to decide this issue on a broad basis. Appellees will receive all the relief they have requested and to which they are entitled on either ground. Accordingly, we accept the Village's concession that the insurance requirement cannot be applied here,[21] which is plainly mandated by the record and the pertinent case law, and affirm the judgment as it bears on §§ 27-54 and 27-56(j) on that basis.
 
 
 58
 Relying on United States v. O'Brien, supra, Judge Sprecher would uphold the "facially neutral" insurance requirement. It is true that the requirement does not turn on the content of a proposed demonstration, except in the sense that controversial groups will likely be unable to obtain insurance, as here. (That several less controversial groups were able to do so, of course, proves nothing.) But it is most assuredly not facially neutral towards First Amendment activity, which is what O'Brien requires. O'Brien was convicted of destroying his draft card. The pertinent statute, which the Court found important to the efficient operation of the Selective Service System, criminalized nothing more, and in no way restricted the right to speak or demonstrate against the draft or the Vietnam War. The Court emphasized that the statute "on its face deals with conduct Having no connection with speech. . . ." 391 U.S. at 375, 88 S.Ct. at 1678 (emphasis added). The O'Brien test, then, deals only with situations where such nonspeech conduct is entwined with speech elements and a restriction on that conduct creates merely "incidental limitations" on protected activity. Id. at 376, 88 S.Ct. 1673. The limitations here totally and directly prohibit the First Amendment activity; calling them "incidental" manner restrictions does not make them so. See id. at 382, 88 S.Ct. 1673. Moreover, O'Brien did not involve a prior restraint, nor does the dissent's analysis give more than cursory recognition to the increased burden of justifying such restraints.
 
 
 59
 Even if O'Brien's test could somehow be applied here, the use of the insurance requirement to prohibit the proposed demonstration would fail it. First, it is difficult, following even a casual examination of the chronological exegesis of the ordinances, particularly in light of the religious complexion of the Village, to think other than that the governmental interest here was directly related to the suppression of these plaintiffs' First Amendment rights. Second, the governmental interest advanced by the dissent could more narrowly be served by criminalizing, as has no doubt already been done, the conduct (by appellees or others) directly producing any feared injury to persons or property and by marshalling local, county, and state police to prevent violations. See id. at 381-82, 88 S.Ct. at 1681 ("both the governmental interest and the operation (of the statute) are limited to the noncommunicative aspect of O'Brien's conduct"), 382, 88 S.Ct. 1682 ("(f)or the noncommunicative impact of his conduct, and for nothing else, he was convicted"). Instead, the Village has flatly prohibited First Amendment activity, not itself directly productive of the feared injury, by those too controversial to obtain commercial insurance.
 
 
 60
 Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), is also inapposite, both because it involved permit fees carefully designed only to help the town in question defray actual costs incurred in parades, and because there was, in the circumstances of that case, no basis to assume the statute "would be applied so to prevent peaceful picketing . . . ." Id. at 578, 61 S.Ct. at 767.
 
 
 61
 We think the implication in Judge Sprecher's opinion that the district court and this court have engaged in an unseemly "rush" to judgment is without support. The case was before the district court for over six months, and neither party has suggested that this time period was in any way too short to allow the development of a full record and ample argumentation thereon. This court, en banc, did order an accelerated briefing schedule, and an early decision. We have endeavored to expedite decision, because to delay the exercise of First Amendment rights in itself burdens them and may risk their destruction. See Shuttlesworth v. Birmingham, supra, 394 U.S. at 162-63, 89 S.Ct. 935, 22 L.Ed.2d 162 (Harlan, J., concurring); Walker v. City of Birmingham, 388 U.S. 307, 349, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (Brennan, J., dissenting), and cases cited. Appellees' proposed demonstration has already been delayed over a year.
 
 
 62
 The preparation and issuance of this opinion has not been an easy task, or one which we have relished. Recognizing the implication that often seems to follow over-protestation, we nevertheless feel compelled once again to express our repugnance at the doctrines which the appellees desire to profess publicly. Indeed, it is a source of extreme regret that after several thousand years of attempting to strengthen the often thin coating of civilization with which humankind has attempted to hide brutal animal-like instincts, there would still be those who would resort to hatred and vilification of fellow human beings because of their racial background or their religious beliefs, or for that matter, because of any reason at all.
 
 
 63
 Retaining meaning in civil rights, particularly those many of the founding fathers believed sufficiently important as to delay the approval of the Constitution until they could be included in the Bill of Rights, seldom seems to be accomplished by the easy cases, however, and it was not so here.
 
 
 64
 Although we would have thought it unnecessary to say so, it apparently deserves emphasis in the light of the dissent's reference to this court apologizing as to the result, that our Regret at the use appellees plan to make of their rights is not in any sense an Apology for upholding the First Amendment. The result we have reached is dictated by the fundamental proposition that if these civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises.
 
 The judgment of the district court is
 
 65
 AFFIRMED.
 
 
 66
 HARLINGTON WOOD, Jr., Circuit Judge, concurring.
 
 
 67
 Agreeing with Judge Pell's analysis of the law, I join in affirming the judgment of the district court and add only a few footnotes.
 
 
 68
 I would in addition adopt the finding of the district court that Ordinances 995 and 996 are unconstitutionally vague and overbroad as criminal statutes.
 
 
 69
 Since there is ample warning of the proposed event, this situation is not equivalent to the sudden and unfounded cry of "fire" in a crowded and unsuspecting theatre to which it is sometimes analogized.
 
 
 70
 Recognition of the full scope of freedom of speech does not compel anyone to listen, or if listening to believe.
 
 
 71
 It may also be well to remember that often "words die away, and flow off like water leaving no taste, no color, no smell, not a trace."* Any exception, however, to the First Amendment which we might be tempted to fashion for these particular persuasive circumstances would not "die away." It would remain a dangerous and unmanageable precedent in our free and open society.
 
 
 72
 SPRECHER, Circuit Judge, concurring in part and dissenting in part.
 
 
 73
 The basic situation in this case the efforts of avowed and uniformed Hitlerian Nazis to demonstrate without municipal regulations in the streets of a predominantly Jewish village housing some 7,000 Jewish survivors of World War II and their families conjures up a unique amalgam of complex First Amendment concepts such as prior restraint, group libel, fighting words and hostile audiences, incitement to riot, and shouting "fire" in a crowded theater. Seldom before has a federal court been faced with a situation raising such powerful cross-pressures as have been created in this case. For instance, the fact that it now seems to be instilled in Jewish culture to confront threatened oppression with active resistance and aggressive retaliation differentiates this case factually from Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). With a situation that is so unique, it is important to keep in mind Mr. Justice Stevens's admonition from one of the most recent First Amendment cases that "(e)ven within the area of protected speech, a difference in content may require a different governmental response." Young v. American Mini Theatres, Inc., 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310 (1976). There may very well be a necessity for a new balancing of values in these circumstances as opposed to the immediate governmental paralysis which is supposed to occur when the rubric of "prior restraint" is sounded.
 
 
 74
 These are important considerations which at least demand full and unhurried attention which is no longer available in these cases. New York Times Co. v. United States, 403 U.S. 713, 748-63, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (dissenting opinions of Chief Justice Burger, Mr. Justice Harlan and Mr. Justice Blackmun). Difficult constitutional questions show the necessity for a court to take the time required to thoroughly research the assumptions underlying previous decisions as well as to consider a careful and possibly new analytical approach to such cases. See Lucas v. Wisconsin Electric Power Co., 466 F.2d 638, 658-72 (7th Cir. 1972). The prophetic words of Mr. Justice Holmes in his dissent in Northern Securities Co. v. United States, 193 U.S. 197, 400-401, 24 S.Ct. 436, 48 L.Ed. 679 (1904) become more pertinent with the passage of time:
 
 
 75
 Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure . . . .
 
 
 76
 Unique First Amendment controversies require an attempt to consider unique approaches. The very cases which, like the present one, cry for plenary and pensive consideration are dealt with in a feverish haste under great pressure, oftentimes of a court's own making. It is, therefore, with some hesitancy and much concern that I approach the instant case. My wariness is enhanced by the fact that each court dealing with these precise problems (the Illinois Supreme Court, the District Court and this Court) feels the need to apologize for its result. Finally, my problems with the case have been enlarged by the wholesale concessions made by the Village officials.
 
 
 77
 * On May 2, 1977, the Village of Skokie (Village) enacted three ordinances relating to public assemblies and parades. The first, # 994, is a comprehensive permit system for all public assemblies which are to include more than 50 persons or vehicles. The second, # 995, prohibits the dissemination of material which promotes and incites racial or religious hatred with the intent to incite such hatred. The third, # 996, prohibits public demonstrations by members of political parties wearing military-style uniforms.[1] These last two ordinances are both criminal measures and also are read into and enforced through the permit mechanism of # 994.[2]
 
 
 78
 On June 2, 1977, plaintiffs Frank Collin and the National Socialist Party of America applied for a permit under Ordinance # 994. This application was denied by the Village on June 27, 1977, because it violated Ordinance # 996 in that Collin wanted to hold a public demonstration while wearing military-style uniforms. Plaintiffs filed suit attacking the constitutionality of these ordinances. The district court found portions of Ordinance # 994 and all of Ordinances # 995 and # 996 to be facially unconstitutional and the court granted declaratory and injunctive relief. The Village appeals from that decision.
 
 II
 
 79
 A prerequisite to obtaining a permit under Ordinance # 994 for a public assembly of greater than 50 persons is provided in section 27-54:
 
 
 80
 No permit shall be issued to any applicant until such applicant procures Public Liability Insurance in an amount of not less than Three Hundred Thousand Dollars ($300,000.00) and Property Damage Insurance of not less than Fifty Thousand Dollars ($50,000.00). Prior to the issuance of the permit, certificates of such insurance must be submitted to the Village Manager for verification that the company issuing such insurance is authorized to do business and write policies of insurance in the State of Illinois.
 
 
 81
 This requirement is enforced through section 27-56(j) and may be waived by a unanimous vote of the President and Board of Trustees of the Village under section 27-64.
 
 
 82
 The district court held this provision to be unconstitutional and the majority here affirms that conclusion.[3] I disagree and respectfully dissent from that part of the majority opinion.
 
 
 83
 An analysis of the insurance requirement begins with the assumption that plaintiffs' proposed activities are protected under the First Amendment.[4] First Amendment activities, however, do not escape all restraint or regulation. "Reasonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment." Young v. American Mini Theatres, Inc., 427 U.S. 50, 63 n.18, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976).
 
 
 84
 There is no dispute with plaintiffs' claim that the insurance requirement of the permit ordinance is a "prior restraint" on their freedom to assemble and march. It must be emphasized, however, that this label is merely an aid to categorization of First Amendment restraints and not a conclusion that those restraints are Per se invalid.[5] Indeed, all permit or licensing systems regulating First Amendment activities are "prior restraints" in this sense.
 
 
 85
 The insurance ordinance in question here is a restriction on the manner in which public assemblies may take place in the Village of Skokie without regard to their content. The test for an ordinance which incidentally affects First Amendment rights was succinctly stated in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):
 
 
 86
 (A) government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 87
 While plaintiffs do not claim that the first of the requirements is unfulfilled, the others raise some questions.
 
 
 88
 The district court used as one basis for voiding the ordinance the conclusion that the insurance requirement was not "directly related to the accomplishment of legitimate governmental purposes," which is a paraphrase of the second requirement of the O'Brien test. The protection of the safety and the property rights of its citizens, however, is not only a proper subject for the exercise of a municipality's authority, but a local government would be remiss if it did not provide these fundamental protections. In Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the Supreme Court upheld an assembly permit ordinance which provided for a graduated fee schedule up to a maximum of $300, depending on the costs of administering and policing an assembly. The Court stated at 574, 61 S.Ct. at 765:
 
 
 89
 Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. . . . (R) egulation of the use of the streets for parades and processions is a traditional exercise of control by local government . . . .
 
 
 90
 It thus seems evident that the insurance regulation involved here furthers an important governmental interest, namely, protecting the property in the Village and assuring that any loss will be covered, as well as guarding the safety of both the marchers and the citizens of Skokie.[6]
 
 
 91
 The third aspect of the O'Brien test is the requirement that the "governmental interest is unrelated to the suppression of free expression." This test is clearly met since an interest in the protection of property and the safety of citizens is not related to the expression of opinions. Indeed, this governmental interest exists at all times and merely becomes more difficult to attain during demonstrations and parades. This difficulty, however, is unrelated to the Village's agreement with the ideology being expressed.
 
 
 92
 Nor can the ordinance be invalidated on the basis of a claim that it was enacted by the Village with the motive to suppress the plaintiffs' freedom of speech. The same argument was made in O'Brien and the Court responded, 391 U.S. at 383, 88 S.Ct. at 1682:
 
 
 93
 It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . . This fundamental principle of constitutional adjudication was reaffirmed and the many cases were collected by Mr. Justice Brandeis for the Court in Arizona v. California, 283 U.S. 423, 455 (51 S.Ct. 522, 75 L.Ed. 1154) (1931).
 
 
 94
 I therefore would conclude that the insurance ordinance is designed to further a governmental interest of protecting persons and property which is unrelated to the suppression of free expression.
 
 
 95
 The final and most challenging part of the O'Brien test requires the incidental restrictions on First Amendment rights to be no greater than is essential to further the governmental interest involved. Initially, it must be noted that the amount of insurance required is not extremely large, especially considering that the requirement is only imposed when the demonstrating or assembling group exceeds 50 persons or vehicles. Indeed, the amount required here is less than what many individuals carry in personal automobile insurance. Thus, this facially neutral insurance requirement seems to impose no greater burden than is necessary to achieve the result desired.
 
 
 96
 Plaintiffs contend, however, that insurance will be difficult or expensive for them to procure and that this fact should somehow invalidate a facially neutral ordinance. They argue that this is an unreasonable burden on their constitutional rights. The district court and the majority here agree, and thus hold that the insurance requirement is unconstitutional.[7] This result seems to follow from no reasonable constitutional analysis.
 
 
 97
 We begin with a facially neutral insurance requirement properly within the Village's police powers and designed to protect against loss to the citizens of Skokie. The private insurance market then tells the plaintiffs, in effect, that personal and property damage is so likely to occur when they march that the insurance will be difficult or expensive to obtain. This does not prove that the ordinance is irrational or burdensome; on the contrary, it shows that the insurance requirement furthers a compelling interest of the Village, namely, the protection of its citizens and the avoidance of having its citizens as a whole absorb the cost of damage done by a few. Put another way, the difficulty encountered by the plaintiffs in obtaining insurance coverage fortifies the conclusion that there is justifiable reason to be concerned about damage to property and injury to individuals. Indeed, the gist of the plaintiffs' anomalous argument is that they are such a bad insurance risk that they should be allowed to cause or provoke almost certain damage and to shift the risk to the Village while peaceful groups unlikely to create any problems must furnish the insurance and pay the necessary premiums. Such a conclusion is poor economics and poorer constitutional reasoning.[8]
 
 
 98
 In Cox v. New Hampshire, supra, the Supreme Court upheld a permit fee ordinance where the fee could vary from a nominal amount up to $300, depending on the public expense of policing the spectacle. There the amount of the fee was to be determined by the municipality, whereas here it is fixed by the competitive market. Even so, the Court found the flexible fee system valid and stated:
 
 
 99
 There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated. The suggestion that a flat fee should have been charged fails to take account of the difficulty of framing a fair schedule to meet all circumstances, and we perceive no constitutional ground for denying to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought.
 
 
 100
 312 U.S. at 577, 61 S.Ct. at 766. That reasoning applies with equal force in the instant case.
 
 
 101
 I thus would uphold this facially neutral insurance requirement as a clearly constitutional "manner" restriction on First Amendment activities. The Village has a right and a duty to protect its citizens and property in this reasonable manner.
 
 
 102
 Unfortunately, we did not have an opportunity to observe the ordinance at work in this case. Plaintiffs' application was rejected because they planned to wear military-style uniforms, so that the question of the insurance requirement was not passed on by the Village. Plaintiffs asked the Village in their application either to help them procure insurance or to waive that requirement.[9] In their rush to invalidate this ordinance, however, the district court and the majority did not give the Village an opportunity to determine how the insurance requirements apply, much less to apply them unconstitutionally.
 
 
 103
 No individual group has as yet been denied the right to march because of the insurance ordinance involved here and several other groups have met the requirement and have paraded in Skokie. The ordinance is reasonable and neutral on its face, is designed to further a compelling governmental interest and has not been applied discriminatorily.[10] This exercise of municipal authority is in no sense an abridgement of First Amendment rights "in the guise of regulation." Hague v. C. I. O., 307 U.S. 496, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Mr. Justice Roberts, joined by Mr. Justice Black).
 
 III
 
 104
 Up to this point the analysis assumed the validity of two premises. The first is that the activities which plaintiffs proposed to engage in are protected by the First Amendment. The second is that it is impermissible for a government to consider in any way the content of the activities or speech when regulating the time, place or manner in which that activity takes place. A closer examination of each of these assumptions fortifies the conclusion that the insurance ordinance is constitutional not only on its face, but also as applied to the facts of this case.
 
 
 105
 We must first examine whether plaintiffs' proposed conduct falls within the scope of the First Amendment. We are dealing with a proposed march through a predominantly Jewish community. The plaintiffs would wear nazi-style uniforms and swastika armbands or emblems and carry written signs. No speeches were to be made.[11] Plaintiffs' handbills had been distributed in the Village[12] and a number of Skokie residents with Jewish surnames had received "offensive and threatening telephone calls."[13] The portent of this action and the proposed march could not be lost on anyone familiar with the methods of Hitler's Nazis in Germany.[14]
 
 
 106
 Under these circumstances, the appearance of plaintiffs' group in Skokie may be so extremely offensive and of such little social utility as to be beyond the protection of the First Amendment.[15] In this sense the present case does not differ greatly from Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), where the Court upheld the conviction of a Jehovah's Witness for calling complainant a "God damned racketeer" and "a damned fascist." The analysis the Court used there applies with equal force here to the activities proposed by plaintiffs:
 
 
 107
 Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include . . . "fighting" words those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . ."
 
 
 108
 Id. at 571-72, 62 S.Ct. at 769 (footnotes omitted).
 
 
 109
 Another basis on which to conclude that plaintiffs' proposed conduct falls outside the protection of the First Amendment is that under the circumstances it constitutes a pernicious form of group libel. In Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), the Court upheld a statute which is strikingly similar to those attacked here. The Court there declared:
 
 
 110
 It is not within our competence to confirm or deny claims of social scientists as to the dependence of the individual on the position of his racial or religious group in the community. It would, however, be arrant dogmatism, quite outside the scope of our authority in passing on the powers of a State, for us to deny that the Illinois legislature may warrantably believe that a man's job and his educational opportunities and the dignity accorded him may depend as much on the reputation of the racial and religious group to which he willy-nilly belongs, as on his own merits. This being so, we are precluded from saying that speech concededly punishable when immediately directed at individuals cannot be outlawed if directed at groups with whose position and esteem in society the affiliated individuals may be inextricably involved.
 
 
 111
 Id. at 263, 72 S.Ct. at 733. Nor do we need to back away from this analysis merely because the Supreme Court has substantially modified the law of libel insofar as it relates to public officials or public figures as opposed to the minor backtracking concerning libel of private individuals. Compare New York Times Co. v. Sullivan, 376 U.S. 254, 268, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) With Gertz v. Robert Welch, Inc., 418 U.S. 323, (1974). Moreover, although Beauharnais is said to have been scarcely noted since 1952, neither has it been overruled.
 
 
 112
 It appears to me that plaintiffs' proposed activities, under the circumstances presented here, might reasonably be viewed as not within the area of constitutionally protected activity. At least the question seems close enough to warrant serious concern and analysis within the factual situation presented. Plaintiffs' proposed actions in this case arguably "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Chaplinsky v. New Hampshire, supra, 315 U.S. at 572, 62 S.Ct. at 769. This conclusion supports a finding at the very least of the validity of the challenged insurance ordinance.
 
 IV
 
 113
 Concerning the assumption that the content of speech or conduct is an impermissible consideration when regulation of those activities are proposed, we note that regulation of First Amendment activities never has been and never can be "content blind." As early as 1919, the Supreme Court in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, declared through Mr. Justice Holmes:
 
 
 114
 The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.
 
 
 115
 There is no dispute that speech may not be suppressed merely because it offends its listeners. Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). At some point, however, considerations of a neutral desire to maintain the public peace and general welfare come into play in determining whether activities should be allowed. Feiner v. New York, 340 U.S. 315, 320, 71 S.Ct. 303, 95 L.Ed. 295 (1951). Where the activity is, as here, by its nature and by the circumstances, a threat to a reasonable attempt to maintain the public order, it cannot claim to go unregulated under the auspices that content may not properly be considered.
 
 
 116
 Such considerations apply with added force where the municipality does not seek to prevent the conduct proposed, but simply proposes to protect against the consequences of such activity. The insurance ordinance at issue here merely attempts to provide this protection. The Village should not be required to ignore the dangers that are presented by plaintiffs' conduct. We noted at the outset that the Supreme Court has recently recognized that "(e)ven within the area of protected speech, a difference in content may require a different governmental response." Young v. American Mini Theatres, Inc., 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310 (1977). In my opinion the response of the Village of Skokie in enacting the insurance ordinance was constitutionally permissible.
 
 
 117
 For the reasons discussed above, I would reverse the decision of the district court declaring the insurance requirement of the ordinance unconstitutional.
 
 
 
 [1]
 In Collin's words:
 We wear brown shirts with a dark brown tie, a swastika pin on the tie, a leather shoulder strap, a black belt with buckle, dark brown trousers, black engineer boots, and either a steel helmet or a cloth cap, depending on the situation, plus a swastika arm band on the left arm and an American flag patch on the right arm.
 
 
 [2]
 In 1974, 40,500 of the Village's 70,000 population were Jewish
 
 
 [3]
 The district court herein found as a matter of legislative intent that the ordinances in question were designed to cover Nazi marches. The appellants do not attack the finding
 
 
 [4]
 Section 27-52 of the ordinance requires application for a permit at least 30 days before the proposed parade. Like some other provisions of 994, it is not challenged here. We are informed that appellees by registered letter of April 11, 1978, have applied for a permit to demonstrate on June 25, 1978
 
 
 [5]
 A renewed permit application for June 25, 1978, was sent to the Village on April 11, 1978, and contains similar recitations
 
 
 [6]
 Collin testified, however, that NSPA did not advocate genocide as a solution to the "Jewish problem," but was content to expose to the American people what his group conceived that problem to be
 
 
 [7]
 Because the armbands are to be worn during a group demonstration, See id. at 508, 89 S.Ct. 733, their display cannot stand entirely alone. On the other hand, it is worth noting that the display of tiepins, armbands, or a flag here, is not an example of pure conduct that is asserted to have expressive value, which may be somewhat more easily regulated. See United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)
 
 
 [8]
 Thus these are not appropriately narrow ordinances, criminalizing, E. g., the invasion of residential neighborhoods by sound trucks blaring racial epithets or other messages, See Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), or the menacing by uniformed bullies of a survivor of the holocaust, or anyone else, on the street, or at his or her residence, See Rowan v. Post Office Department, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), and we decline to treat them viscerally as if such were their scope. Logically, we consider only whether These ordinances can prohibit the type of conduct and content this case involves
 
 
 [9]
 Collin, at least, in his verified complaint, alleged that Village officials advised him that this and the other ordinances would be applied to his and NSPA's proposed demonstration, and the Village has never suggested that this ordinance might not be applied thereto
 
 
 [10]
 The Village understandably offers no guarantee that there will not be violence, but commendably advises us that if a final order in this case requires it to permit the march, it will make every effort to protect the demonstrators (and the Village) from responsive violence
 
 
 [11]
 Because the ordinance does not even refer to such a breach, the ordinance would inevitably fall, if Chaplinsky were its basis, because of overbreadth and vagueness. See Gooding, supra
 
 
 [12]
 The actual language in Beauharnais, see id. at 251, 72 S.Ct. 725, invoked specifically the depiction of criminality, depravity, unchastity, or lack of virtue in target groups, and is thus most like the language of 994 § 27-56(c), discussed Infra
 
 
 [13]
 It bears noting that we are Not reviewing here a law which prohibits action designed to impede the equal exercise of guaranteed rights, See, e. g., 18 U.S.C. §§ 241, 245, or even a conspiracy to harass or intimidate others and subject them thus to racial or religious hatred. See Beauharnais, supra, 343 U.S. at 284, 75 S.Ct. 725 (Douglas, J., dissenting). If we were, we would have a very different case
 
 
 [14]
 The district court found this reading of Beauharnais to be at least plausible, relying to some degree on the Court's statement that as libelous utterances were not within the area of protected speech, it was unnecessary "to consider the issues behind the phrase 'clear and present danger.' " 343 U.S. at 266, 72 S.Ct. at 735. That statement, however, was a logical emanation from the conclusion that criminal libel lacked First Amendment protection, which conclusion was premised in turn on the tendency to incite violence that justified criminal libel law. We do not read it as establishing an alternative ground of decision
 
 
 [15]
 We also note that we have found nothing in Supreme Court opinions after Beauharnais to support this interpretation. Indeed, in both New York Times Co. v. Sullivan, 376 U.S. 254, 268, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and Garrison v. Louisiana, 379 U.S. 64, 70, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court's brief references to Beauharnais treated it as a case involving a likelihood of violence
 
 
 [16]
 Ironically the witnessing of the television show "Holocaust" might seem to have the same trauma producing possibilities. The extent to which the residents of Skokie may have willingly exposed themselves to the painful reminders of this production might have been pertinent to the psychic trauma issue if the airing had occurred prior to the district court evidentiary hearing
 
 
 [17]
 These questions, of course, are not before us, and we intimate no views thereon, one way or the other
 
 
 [18]
 We appreciate that, as the Village's expert psychiatrist testified, avoidance might also be psychologically unsatisfying to some of the Village's residents. Nonetheless, the choice will be theirs, and it meaningfully undercuts the invasion of privacy justification for 995. See Erznoznik, supra, 422 U.S. at 210-11, 95 S.Ct. 2268; Cohen, supra, 403 U.S. at 21, 91 S.Ct. 1780
 
 
 [19]
 Judge Sprecher's thorough discussion of the contrary position is somewhat surprising, in view of the Village's total failure to attempt to defend application of the insurance requirement. Surely Mitchell v. Archibald & Kendall, Inc., 573 F.2d 429, No. 77-2216 (7th Cir. 1978) (alternate holding), does not support the conclusion that a reviewing court should reach out to salvage non-jurisdictional defenses conceded after trial to be invalid. The concession in issue there was for the purposes of an appeal from a dismissal of a complaint. Obviously such a concession would not waive a later invocation of a defense, if further proceedings had been required. Moreover, the dissent's quotation from Mitchell significantly omits the substance of both the concession (that the plaintiff was at the date and time of his injury an invitee To be on defendant's premises ) and the defense (that plaintiff could not invoke the legal Duties owed to an invitee for injury incurred Off the premises and on a public street). The latter position, indeed, was strenuously urged on appeal, although the defendant did not in terms articulate the legal theory that plaintiff had thus ceased to be an invitee
 
 
 [20]
 The court also found that the co-sponsorship device had in fact been used to allow parades by "acceptable" organizations which did not satisfy the insurance requirement. That the parades in question were of the type traditionally found acceptable by municipalities, including Skokie, does not change the fact that the Village has created and used a device to exempt parades it has regarded as acceptable from the burdens of the insurance requirement, in its discretion
 
 
 [21]
 The dissent's implication that we ought to wait to see exactly how and whether the Village would apply the requirements to appellees is unacceptably academic. The history of this litigation gives no reason at all to assume that the Village would gratuitously waive the requirements for these plaintiffs, and if the Village knew of some way to aid plaintiffs' search for commercial insurance, one might have expected it at some point in this litigation to say so. It has not, and plaintiffs' evidence that insurance is unavailable to them stands entirely uncontradicted. The suggestion that insurance maintained by the Village might be made available to plaintiffs is incredible: if a policy exists that would cover public liability for the proposed demonstration, what conceivable justification can there be for §§ 27-54 and 27-56(j)? If any existing policy would not now cover the demonstration, surely the Village will not be able even if it were willing unilaterally to extend coverage. The consent of the insurer would be required, and the evidence adduced herein gives us every reason to doubt it would be forthcoming. Not worthy of comment is the possibility that the Village might generously decide that plaintiffs could purchase their First Amendment rights with a bond of some $300,000 of their own money in lieu of insurance
 We have, because of the dissent's position on the matter of the insurance ordinance, revised the original draft of this opinion to advert to what appear to us to be some of the more patent frailties of this non-controverted judicially revived issue. We have not because of our belief in the lack of real substance to the issue pursued other rather obvious difficulties presented by the particular ordinance such as its vagueness. Who is the insured? Is the Village to be an additional insured? If the insured parties are to be the plaintiffs how under established insurance law could the plaintiffs assert any claims for injuries they might receive?
 
 
 *
 Alexander Solzhenitsyn, Nobel Lecture, 1972
 
 
 [1]
 The key provisions are:
 # 994 Sec. 27-56(c): A permit will issue if
 The conduct of the parade, public assembly, or similar activity will not portray criminality, depravity or lack of virtue in, or incite violence, hatred, abuse or hostility toward a person or group of persons by reason of reference to religious, racial, ethnic, national or regional affiliation.
 # 995 Sec. 28-43.1:
 The dissemination of any materials within the Village of Skokie which promotes and incites hatred against persons by reason of their race, national origin, or religion, and is intended to do so, is hereby prohibited.
 # 996 Sec. 28-42.1:
 No person shall engage in any march, walk or public demonstration as a member or on behalf of any political party while wearing a military-style uniform.
 
 
 [2]
 A provision of Ordinance # 994, Section 27-56(c), requires that a permit be denied to assemblies which will engage in activities substantially similar to those prohibited by # 995. A catch-all provision, section 27-56(i), serves the same purpose for # 996
 
 
 [3]
 On appeal defendants conceded the invalidity of the insurance requirements insofar as they are applicable to the plaintiffs in this case (Defendants-Appellants Brief p. 4). This court has previously recognized in another context that "(w)e do not regard the defendant-appell(ants') concession . . . as an irrevocable waiver of its defense . . . ." Mitchell v. Archibald & Kendall, Inc., 573 F.2d 429, No. 77-2216 (7th Cir. 1978), at 16. I believe that this conclusion is particularly appropriate where the concession is used to avoid an important constitutional question that was fully considered and resolved by the district court and thoroughly briefed before us by the party urging the unconstitutionality of the statute
 
 
 [4]
 Whether this activity Is protected at all by the First Amendment and what degree of protection should be afforded are discussed in Parts III and IV, Infra
 
 
 [5]
 The cry of "prior restraint" is a classic example of the tyranny of words which often accompanies the uncritical employment of a once-useful phrase. As Mr. Justice Frankfurter noted in Tiller v. Atlantic Coast Line R. R., 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1943) (concurring):
 A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas.
 
 
 [6]
 Frank McCabe, Village Trustee, gave some of the reasons for the ordinance:
 We felt that we had considerable liability if they came in here and got hurt. We felt that most of the all of the work that we were doing and the meetings that we had, especially prior to the Fourth of July, all concerned themselves with our responsibility to keep them from getting injured.
 The ordinances were directed primarily to give the Village of Skokie better control over many things.
 The first ordinance, we had strong concerns over kids that were out, and on weekends, we have a lot of traffic passing through Skokie. Anybody that goes to or from Evanston and wants to get to the Edens Expressway has to go through Skokie. We get busy traffic up and down our streets.
 We were looking to protect these people.
 McCabe Deposition pp. 26, 29.
 
 
 [7]
 Preliminarily, the fact that various other organizations had no difficulty in procuring insurance coverage should have counselled the district court from rushing headlong to invalidate this ordinance. See Defendant's Exhibits 3b, 3g and 3n. Obviously, the insurance requirement did not seem to be an unreasonable burden as to these groups
 
 
 [8]
 If the Village had provided for a fixed premium, rather than a fixed coverage, insurance system applicable to all groups regardless of the nature of the group or the type of activity, the ordinance probably would have been challenged on the basis that it did not adequately distinguish between the various groups and therefore imposed an unreasonable and unconstitutional burden on groups which are low insurance risks
 
 
 [9]
 The application letter of June 22, 1977, from plaintiff Frank Collin provided, in part:
 As authorized by § 27-64, we hereby request that the insurance requirement of § 27-54 be waived by the Village of Skokie for the reason that such insurance is not available to the National Socialist Party of America. If the Village of Skokie has retained insurance agents willing to provide the coverage at reasonable cost, or knows where the specified coverage can be obtained, please advise me at once.
 Due to the district court's and the majority's dispatch in invalidating wholesale the statutes involved, we do not know what the response of the Village to this request would have been.
 It is possible that the Village could use its own business contacts to procure insurance for such an organization at the organization's expense. Alternatively, the Village could agree to allow its own insurance to cover the event and get Pro rata reimbursement of the premium from the group. Another possibility is the posting of a cash bond to cover damage and injuries and which would be returned if no incidents occurred. If all else failed the requirement could then be waived if necessary to avoid constitutional infirmity.
 
 
 [10]
 Other groups have been required to fulfill the insurance requirements. See Defendants' Exhibits 3b, 3g and 3n. These requirements have not been waived for any group. Plaintiffs make much of the possibility, however, that the waiver provision of section 27-64 may be applied in the future to waive the insurance requirements discriminatorily. The district court was concerned "because some organizations may be exempted from (the insurance) requirements and there are no principled standards for determining which organizations are exempt." The majority shares this concern. So far, however, no group has been exempted from these requirements under the waiver provision, so that a cry of discrimination is certainly pure conjecture. Moreover, insofar as the waiver provision lacks standards and May possibly be applied in a discriminatory manner, this alleged vagueness has not as yet had an impact on plaintiffs' rights. Thus, plaintiffs are attacking the ordinance on its face as a representative of all groups who wish to parade. The Supreme Court in Young v. American Mini Theatres, Inc., 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976), however, has made it clear that
 if the statute's deterrent effect on legitimate expression is not "both real and substantial," and if the statute is "readily subject to a narrowing construction by the state courts," see Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (95 S.Ct. 2268, 45 L.Ed.2d 125), the litigant is not permitted to assert the rights of third parties.
 I believe this rule applies in the present case.
 Plaintiffs (and both the district court and the majority) also make much of alleged "co-sponsoring" of activities by the Village which allegedly is a subterfuge for allowing some organizations to avoid the insurance requirements. The two instances of alleged discriminatory "co-sponsorship" were the Memorial Day and Fourth of July parades, which are traditionally sponsored by municipalities and have been so sponsored by the Village of Skokie for years. Apparently none of the participants in these parades were required to fulfill the insurance requirements, presumably since the Village itself has a public liability policy which would cover any mishaps. Moreover, there is no claim that plaintiffs' group would have been required to obtain insurance in order to participate in these parades. Thus, this "co-sponsorship" discrimination argument seems specious at best and at worst, as here, may lead to the invalidation of an otherwise proper local ordinance. In rushing to protect First Amendment freedoms, we must be cautious so as not to outrun the facts before us. The ordinance should not be struck down on this basis.
 
 
 [11]
 Plaintiffs' Brief p. 4 and Plaintiffs' Exhibit 2. We note that, even assuming that plaintiffs' activities can be found to fall in a class protected by the First Amendment, such activity is not "pure speech" and is thereby properly subject to more concern and regulation by municipalities. As stated by the Supreme Court in Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969):
 It is argued, however, that what was involved here was not "pure speech," but the use of public streets and sidewalks, over which a municipality must rightfully exercise a great deal of control in the interest of traffic regulation and public safety. That, of course, is true. We have emphasized before this that "the First and Fourteenth Amendments (do not) afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471. "Governmental authorities have the duty and responsibility to keep their streets open and available for movement." Id. at 554-555, 85 S.Ct. at 464.
 Accord, Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). A proper balancing of the public interest with the expression of ideas in this manner therefore must take place. See United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
 
 
 [12]
 Plaintiffs' Brief p. 3. An example of one of these leaflets, Defendant's Exhibit 9, provides, in part:
 (W)e have decided to relocate in areas heavily populated by the real enemy the Jews.
 An old maxim goes: "Where one finds the most Jews, there also shall one find the most Jewhaters." With this basic truth in mind, we are now planning a number of street demonstrations and even speeches in Evanston, Skokie, Lincolnwood, North Shore, Morton Grove, etc. This leaflet is but the first of a number now being prepared for eventual mass-distribution. A beautiful full-color poster, 18 inches by 30 inches, with non-removable adhesive on the back, is already in the works. The poster shows three rabbis involved in the ritual murder of an innocent Gentile boy during the hate-fest of Purim.
 
 
 [13]
 Plaintiffs' Brief p. 3. Police reports on the complaints to police which followed these calls are produced as Defendants' Exhibits 4A-4V
 
 
 [14]
 Hitler summed up the strategy of the mass demonstration as used by both fascism and communism: "We should not work in secret conventicles, but in mighty mass demonstrations, and it is not by dagger and poison or pistol that the road can be cleared for the movement but By the conquest of the streets. We must teach (them) that the future Master of the streets is National Socialism, just as it will some day be the master of the state." (Emphasis supplied.) 1 Nazi Conspiracy and Aggression (GPO, 1946) 204, 2 Id. 140, Docs. 2760-PS, 404-PS, from "Mein Kampf." First laughed at as an extravagant figure of speech, the battle for the streets became a tragic reality when an organized Sturmabteilung began to give practical effect to its slogan that "possession of the streets is the key to power in the state." Ibid., also Doc. 2168-PS
 The present obstacle to mastery of the streets by either radical or reactionary mob movements is not the opposing minority. It is the authority of local governments which represent the free choice of democratic and law-abiding elements, of all shades of opinion, but who, whatever their differences, submit them to free elections which register the results of their free discussion. The fascist and communist groups, on the contrary, resort to these terror tactics to confuse, bully and discredit those freely chosen governments. Violent and noisy shows of strength discourage participation of moderates in discussions so fraught with violence, and real discussion dries up and disappears. And people lose faith in the democratic process when they see public authority flouted and impotent and begin to think the time has come when they must choose sides in a false and terrible dilemma such as was posed as being at hand by the call for the Terminiello meeting: "Christian Nationalism or World Communism Which?"
 This drive by totalitarian groups to undermine the prestige and effectiveness of local democratic governments is advanced whenever either of them can win from this Court a ruling which paralyzes the power of these officials. This is such a case.
 Terminiello v. Chicago, 337 U.S. 1, 23-24, 69 S.Ct. 894, 904-905, 93 L.Ed. 1131 (1949) (Mr. Justice Jackson, dissenting).
 
 
 [15]
 It is not clear from Supreme Court opinions exactly what it means to say that such activity is "not protected." On the one hand, it seems to mean that this speech is not treated as speech for First Amendment purposes and therefore First Amendment principles do not apply. Roth v. United States, 354 U.S. 476, 481-85, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Miller v. California, 413 U.S. 15, 23-24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Other cases imply that, although First Amendment principles apply to such speech initially, the fact that the activity falls within certain designated categories (E. g., libel, fighting words) means that there exists a sufficient basis for regulating that speech. Cohen v. California, 403 U.S. 15, 19-20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Erznoznik v. City of Jacksonville, 422 U.S. 205, 209-10, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). Regardless of what it means to say that some activity is "not protected" by the First Amendment, it is clear that the restrictions on government regulation in such circumstances is less stringent