The UWM POST, INCORPORATED, Lafi Abdalla, Stephanie Bloomingdale, Kent Farnsworth, Theresa Flynn, Richard D. Leonard, Michael J. Mathias, Marcia Meyer, Ron Novy, Robin Pharo, Carrie Worthen and John Doe, Plaintiffs,

v.

BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant.

No. 90–C–328.

United States District Court, E.D. Wisconsin.

Oct. 11, 1991.

Jeffrey J. Kassel, Brady C. Williamson, LaFollette & Sinykin, Madison, Wis., for plaintiffs.

Nadim Sahar, Asst. Atty. Gen., Milwaukee, Wis., for defendant.

## ORDER

.WARREN, Senior District Judge.

On March 29, 1990, the UWM Post, Inc. and others ("plaintiffs") filed this action seeking that this Court enter a declaratory judgment that Wis.Admin.Code § UWS 17.-06(2) (the "UW Rule") on its face violates: (1) plaintiffs' right of free speech guaranteed by the First Amendment to the United States Constitution and by Article I, Section 3 of the Wisconsin Constitution and (2) plaintiffs' right to due process and equal protection of the laws guaranteed by the Fourteenth Amendment and by Article I, Section 1 of the Wisconsin Constitution. In addition, plaintiffs request that this Court: (1) enter a permanent injunction prohibiting the Board of Regents of the University of Wisconsin System (the "Board of Regents" or the "Board") and its agents and employees from enforcing the UW Rule; (2) order the Board of Regents to vacate the disciplinary action taken against plaintiff John Doe under the UW Rule and expunge from his files all records related to that action and (3) award plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Now before Court are the parties' cross motions for summary judgment.

### I. BACKGROUND

#### A. DEVELOPMENT OF THE UW RULE

In May of 1988, the Board of Regents adopted "Design for Diversity," a plan to increase minority representation, multi-cultural understanding and greater diversity throughout the University of Wisconsin System's 26 campuses. Design for Diversity responded to concerns over an increase in incidents of discriminatory harassment.[1]

---

**1.** Concerns regarding discriminatory harassment are not unique to the University of Wisconsin System. At least fifteen colleges and universities, including nine state institutions,

For example, several highly publicized incidents involving fraternities occurred at the University of Wisconsin—Madison. In May of 1987, a fraternity erected a large caricature of a black Fiji Islander at a party theme. Later that year, there was a fight with racial overtones between members of two fraternities. In October of 1988, a fraternity held a "slave auction" at which pledges in black face performed skits parroting black entertainers. *See* the *Capitol Times*, Nov. 17, 1988, p. 25.

Design for Diversity directed each of the UW System's institutions to prepare non-discriminatory conduct policies. In addition, pursuant to the plan, the Board of Regents approved its "Policy and Guidelines on Racist and Discriminatory Conduct," which stated the Board's general policy against discrimination and provided guidance to the individual campuses in developing their own non-discrimination policies. Finally, the Board established a working group to draft amendments to the student conduct code, Chapter UWS 17, to implement its policy system-wide.[2] With the help of UW–Madison Law School Professors Gordon Baldwin, Richard Delgado and Ted Finman, the group developed a proposed rule based, in part, on a policy being developed simultaneously at the UW–Madison. The professors agreed that the proposed rule would likely withstand attack on First Amendment grounds if it included a requirement that the speaker intended to make the educational environment hostile for the individual being addressed.

At its April 7, 1989 meeting, the Board of Regents discussed issuing the proposed rule on an emergency basis in light of the increasing number of incidents of racial and discriminatory harassment. By a 8 to 7 vote, the Board decided not to promul-gate the rule on an emergency basis. Instead, the Board advanced the proposal through the regular administrative rule-making procedure. On June 8, 1989, the Board held a public hearing to provide an opportunity for interested persons to comment on the proposed rule. On June 9, 1989, the Board adopted the UW Rule by 12 to 5 vote.

B.  THE UW RULE

The UW Rule provides:

UWS 17.06 Offenses defined. The university may discipline a student in non-academic matters in the following situations.

.     .     .     .     .

(2)(a) For racist or discriminatory comments, epithets or other expressive behavior directed at an individual or on separate occasions at different individuals, or for physical conduct, if such comments, epithets or other expressive behavior or physical conduct intentionally:

1.  Demean the race, sex, religion, color, creed, disability, sexual orientation, national origin, ancestry or age of the individual or individuals; and

2.  Create an intimidating, hostile or demeaning environment for education, university-related work, or other university-authorized activity.

(b) Whether the intent required under par. (a) is present shall be determined by consideration of all relevant circumstances.

(c) In order to illustrate the types of conduct which this subsection is designed to cover, the following examples are set forth. These examples are not meant to illustrate the only situations or types of conduct intended to be covered.

1.  A student would be in violation if:

have adopted or are considering restrictions on discriminatory hate speech directed at members of historically disadvantaged groups. 103 Harv. L.Rev. 1397 (1990) (citing Wilson, "Colleges' Anti–Harassment Policies Bring Controversy Over Free–Speech Issues," Chronicle of Higher Educ., Oct. 4, 1989, at A I, Col. I).

**2.** At oral argument on the parties' motions, the Board's counsel stressed that the University of

Wisconsin System does not rely solely upon the UW Rule to combat the problem of discriminatory harassment among students. Counsel stated that the UW Rule is merely a "two percent solution." He noted that the system also set and articulated community standards, a "thirty percent solution," and increased education regarding diversity and racism, a "sixty-eight percent solution."

a. He or she intentionally made demeaning remarks to an individual based on that person's ethnicity, such as name calling, racial slurs, or "jokes"; and

b. His or her purpose in uttering the remarks was to make the educational environment hostile for the person to whom the demeaning remark was addressed.

2. A student would be in violation if:

a. He or she intentionally placed visual or written material demeaning the race or sex of an individual in that person's university living quarters or work area; and

b. His or her purpose was to make the educational environment hostile for the person in whose quarters or work area the material was placed.

3. A student would be in violation if he or she seriously damaged or destroyed private property of any member of the university community or guest because of that person's race, sex, religion, color, creed, disability, sexual orientation, national origin, ancestry or age.

4. A student would not be in violation if, during a class discussion, he or she expressed a derogatory opinion concerning a racial or ethnic group. There is no violation, since the student's remark was addressed to the class as a whole, not to a specific individual. Moreover, on the facts as stated, there seems no evidence that the student's purpose was to create a hostile environment.

Wis.Admin.Code § UWS 17.06(2).

Thus, in order to be regulated under the UW Rule, a comment, epithet or other expressive behavior must:

(1) Be racist or discriminatory;

(2) Be directed at an individual;

(3) Demean the race, sex, religion, color, creed, disability, sexual orientation, national origin, ancestry or age of the individual addressed; and

(4) Create an intimidating, hostile or demeaning environment for education, university-related work, or other university-authorized activity.

In addition to the rule, the UW System issued and circulated to its students and faculty a brochure which explains the rule and provides guidance as to its scope and application. *See* Discriminatory Harassment: Prohibited Conduct Under Chapter UWS 17 Revisions. This guide provides some illustrations of situations where the UW Rule applies and does not apply:

*Question 1.* In a class discussion concerning women in the workplace, a male student states his belief that women are by nature better equipped to be mothers than executives, and thus should not be employed in upper level management positions. Is this statement actionable under proposed UWS 17.06(2)?

*Answer:* No. The statement is an expression of opinion, contains no epithets, is not directed to a particular individual, and does not, standing alone, evince the requisite intent to demean or create a hostile environment.

*Question 2.* A student living in the University dormitory continually calls a black student living on his floor "nigger" whenever they pass in the hallway. May the university take action against the name-caller?

*Answer:* Yes. The word "nigger" is an epithet, and is directed specifically at an individual. Its use and continuous repetition demonstrate the required intent on the part of the speaker to demean the individual and create a hostile living environment for him.

*Question 3.* Two university students become involved in an altercation at an off-campus bar. During the fight one student used a racial epithet to prolong the dispute. May the university invoke a disciplinary action?

*Answer:* Perhaps. Use of the epithet, and its direction to an individual suggests a potential violation of proposed s. UWS 17.06(2); however, because the episode occurred off campus, the intent to create a hostile environment for university-authorized activities would be difficult to demonstrate. Additional facts would have to be developed if disciplinary action were to be pursued.

*Question 4.* A group of students disrupts a university class shouting discriminating epithets. Are they subject to disciplinary action under the provisions related to regulation of expressive behavior?

*Answer:* Perhaps. It is clear that the students are subject to disciplinary action for disrupting a class under existing s. UWS 17.06(1)(c)3. The question is whether they also violated the newly created provision concerning expressive behavior, because they shouted epithets while in the course of other misconduct. If the epithets were directed to individuals within class, and were intending to demean them and create an intimidating environment, then the behavior might also be in violation of the provision concerning expressive misconduct.

*Question 5.* A faculty member, in a genetics class discussion, suggests that certain racial groups seem to be genetically pre-disposed to alcoholism. Is this statement subject to discipline under Chapter UWS 17?

*Answer:* No. A faculty member is in no case subject to discipline under Chapter UWS 17, since that chapter applies only to students. This situation would not warrant disciplinary action under any other policy, either, since it is protected expression of an idea.

## C. ENFORCEMENT OF THE UW RULE

To date, at least nine students have been sanctioned under the UW Rule:

(1) The University of Wisconsin—Parkside found that a student used inappropriate language when he called another student "Shakazulu." *See Kassel* Aff., Ex. 19. The university found that the student entered the other student's bedroom area as an uninvited guest and proceeded to use inappropriate language and that later there was a confrontation between the student and residents of the apartment. *See id.* The student was placed on probation and required to consult with an alcohol abuse counselor and to "plan a project in conjunction with the Center for Education and Cultural Advancement to help sensitize [himself] to the issues of diversity." *See id.*

(2) The University of Wisconsin—Eau Claire found that plaintiff John Doe violated the UW Rule by yelling epithets loudly at a woman for approximately ten minutes, calling her a "fucking bitch" and "fucking cunt." *See id.,* Ex. 20. Plaintiff John Doe was responding to statements the woman made in a university newspaper about the athletic department. *Id.* The university placed the student on probation for a semester and required him to perform twenty hours of community service at a shelter for abused women. *See id.*

(3) The University of Wisconsin—Oshkosh disciplined a student for angrily telling an Asian–American student: "It's people like you—that's the reason this country is screwed up" and "you don't belong here." *See id.,* Ex. 21. The student also stated that "Whites are always getting screwed by minorities and some day the Whites will take over." *Id.* The University placed the student on probation for seven months and required him to participate in alcohol abuse assessment and treatment. *See id.*

(4) The University of Wisconsin—Stevens Point found that a student harassed a Turkish–American student by impersonating an immigration official and demanding to see immigration documents. *See id.* Ex. 22. The student signed a "No Contest Agreement" admitting violations of the rule as well as violations of UWS 17.06(4) (conduct obstructing a university official) and his university housing contract. *See id.* The university placed the student on probation for eight months. *See id.*

(5) The University of Wisconsin—Stout charged a student involved in a physical altercation with two residence hall staff members with calling one of them a "piece of shit nigger" and the other a "South American immigrant." *See id.,* Ex. 23. The university also charged the student with misidentifying himself to an investigating officer. *See id.* The student was alleged to have violated the UW Rule as well as UWS 17.06(1) (endangering personal safety) and 17.06(4) (obstructing a uni-

versity official). *Id.* The student waived a formal hearing and accepted a seven-month suspension.

(6) The University of Wisconsin—Eau Claire disciplined a student under the UW Rule for sending a message that stated, "Death to all Arabs!! Die Islamic scumbags!" on a university computer system to an Iranian faculty member. *See* Stipulation of Additional Facts, Ex. A. The university formally reprimanded the student and placed him on probation for the remainder of the semester. *See id.*

(7) The University of Wisconsin—Stevens Point brought a disciplinary action under the UW Rule against a student who stole a TYME automatic bank teller card and access number belonging to his dormitory roommate, who is Japanese. *See id.,* Ex. B. The student acknowledged that he had stolen the TYME card, that he had twice intercepted and opened the Japanese student's correspondence from the bank and that he had successfully withdrawn $60.00 from the Japanese student's bank account using the TYME card and personal identification number he had stolen. *Id.* The student also admitted that he was motivated by his resentment that his roommate is Japanese and does not speak English well. *Id.* The student signed a no contest agreement, acknowledging that he had violated the UW Rule as well as other provisions of the student conduct code. The student was placed on probation through December 31, 1991 and required to take a course in ethics or East Asian history and to make restitution. *Id.*

(8) The University of Wisconsin—Oshkosh disciplined a female student under the UW Rule for referring to a black female student as a "fat-ass nigger" during an argument. *See id.,* Ex. C. The university found that the student violated the rule and another provision of the student code. *See id.* The student, who was already on disciplinary probation, was required to view a video on racism and write an essay and a letter of apology and was reassigned to another residence hall. *See id.*

(9) The University of Wisconsin—River Falls disciplined a male student under the UW Rule for yelling at a female student in public, "you've got nice tits." *See id.,* Ex. D. The university placed the student on probation for the remainder of his enrollment at the university and required him to apologize to the female student, to refrain from any further contact with her and to obtain psychological counseling. *See id.*

## II. DISCUSSION

Plaintiffs argue that this Court should strike down the UW Rule because it violates the overbreadth and vagueness doctrines.

### A. OVERBREADTH

Plaintiffs first argue that the UW Rule is invalid because it is facially overbroad. It is fundamental that statutes regulating First Amendment activities must be narrowly drawn to address only the specific evil at hand. *Broadrick v. Oklahoma,* 413 U.S. 601, 611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

In spite of the above, the Supreme Court has held that "the overbreadth doctrine is 'strong medicine'" and that it should be employed "with hesitation, and then 'only as a last resort.'" *See New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (quoting from *Broadrick* 413 U.S. at 613, 93 S.Ct. at 2916). Only a statute that is substantially overbroad may be invalidated on its face. *Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361. A statute should not be "held invalid on its face merely because it is possible to conceive of a single impermissible application ..." *Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (quoting from *Broadrick,* 413 U.S. at 630, 93 S.Ct. at 2925 (Brennan, J. dissenting)).

Plaintiffs argue that the UW Rule has overbreadth difficulties because it is a content-based rule which regulates a substan-

tial amount of protected speech. In *Police Department of Chicago v. Mosley*, the Supreme Court explained the great import of protecting speech from content-based regulation.

[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."

408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (citations omitted).

Although the First Amendment generally protects speech from content-based regulation, it does not protect all speech. The Supreme Court has removed certain narrowly limited categories of speech from First Amendment protection. These categories of speech are considered to be of such slight social value that any benefit that may be derived from them is clearly outweighed by their costs to order and morality. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). The categories include fighting words, obscenity and, to a limited extent, libel. *Collin v. Smith*, 578 F.2d 1197, 1202 (7th Cir.1978), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

The Board of Regents argues that the UW Rule falls within the category of fighting words. In the alternative, the Board asserts that the balancing test set forth in *Chaplinsky* leaves the speech regulated by

the UW Rule unprotected by the First Amendment. The Board also argues that the Court should find the UW Rule constitutional because its prohibition of discriminatory speech parallels Title VII law. Finally, the Board asserts that, even if the Court finds the rule, as written, unconstitutional, it may apply a narrowing construction which limits the rule's reach to unprotected speech.

(1) WHETHER THE SPEECH REGULATED BY THE UW RULE FALLS WITHIN THE FIGHTING WORDS DOCTRINE.

(a) *The Fighting Words Doctrine*

The Supreme Court in *Chaplinsky* set out the fighting words doctrine. The *Chaplinsky* Court stated:

There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or *"fighting" words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.*

*Chaplinsky*, 315 U.S. at 571–72, 62 S.Ct. at 769 (emphasis added and footnotes omitted).

Thus, the *Chaplinsky* Court set out a two-part definition for fighting words: (1) words which by their very utterance inflict injury and (2) words which by their very utterance tend to incite an immediate breach of the peace. The two parts of the fighting words definition correspond to different concerns regarding reactions to offensive expressions. *See* Rutzick, "Offensive Language and the Evolution of First Amendment Protection," 9 Harv.C.R.–C.L.L.Rev. 1, 6 (1974). The first half relates to the prevention of psychological injury, primarily in the form of emotional upset and injury to the "sensibilities"[3] of addressees. The second half addresses the

---

**3.** The Supreme Court employed the term "sensibilities" in *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). The *Street* Court stated that the state had:

an interest in preventing appellant from uttering words so inflammatory that they would

provoke others to retaliate physically against him, thereby causing a breach of the peace; [and] *an interest in protecting the sensibilities of passers-by who might be shocked by appellant's words* about the American flag....
*Id.* at 591, 89 S.Ct. at 1365 (emphasis added).

prevention of physical retaliation likely to cause a breach of the peace.

While the *Chaplinsky* Court set forth a two-part definition for fighting words, it applied only the second half. The Court did this because the statute in question had been construed to regulate only language which tends to incite an immediate breach of the peace. The statute involved in *Chaplinsky,* Chapter 378, § 2, of the Public Laws of New Hampshire, provided:

> No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with the intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation.

*See Chaplinsky* at 569, 62 S.Ct. at 768. The New Hampshire Supreme Court construed Chapter 378 § 2 such that "no words [are] 'forbidden except such as have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.'" *See id.* at 573, 62 S.Ct. at 770 (citing *State v. Brown,* 68 N.H. 200, 38 A. 731 (1895); *State v. McConnell,* 70 N.H. 294, 47 A. 267 (1900). The *Chaplinsky* court held that the limited scope of Chapter 378 § 2, as construed by the New Hampshire Supreme Court, did not contravene the constitutional right of free expression. *See id.*

Since *Chaplinsky,* the Supreme Court has narrowed and clarified the scope of the fighting words doctrine in at least three ways. First, the Court has limited the fighting words definition so that it now only includes its second half.[4] Second, the Court has stated that in order for words to meet the second half of the definition they must "naturally tend to provoke violent resentment." Finally, the Court has held that fighting words must be "directed at the person of the hearer."

The Supreme Court has reduced the scope of fighting words to include only words which tend to incite an immediate breach of the peace. In *Gooding v. Wilson,* the Supreme Court held that Georgia Code Ann. § 26–6303 was overbroad because "the Georgia appellate decisions [had] not construed § 26–6303 to be limited in application, as in *Chaplinsky,* to words that 'have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.'" 405 U.S. 518, 524, 92 S.Ct. 1103, 1107, 31 L.Ed.2d 408 (1972). Thus, the Court held that § 26–6303 was unconstitutional because it failed to meet the second half of the fighting words doctrine.

Section 26–6303 provided: "Any person who shall, without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace ... shall be guilty of a misdemeanor." *Id.* at 519, 92 S.Ct. at 1104. The Court examined the dictionary definitions of the terms "opprobrious" and "abusive" and found that they have greater reach than "fighting" words.

> Webster's Third New International Dictionary (1961) defined "opprobrious" as "conveying or intended to convey disgrace" and "abusive" as including "harsh insulting language." Georgia appellate decisions have construed § 26–6303 to apply to utterances that, although within these definitions, are not "fighting" words as *Chaplinsky* defines them.

*Id.* at 525, 92 S.Ct. at 1107 (citations omitted). Thus, even though, § 26–6303 regulated only language which inflicts injury or affects the "sensibilities" of the hearer, the Supreme Court held that it did not meet the requirements of the fighting words doctrine because it was not limited to words which "tend to cause an immediate breach of the peace."[5]

---

**4.** The Board concurs that the first half of the fighting words definition now constitutes protected speech. *See* Defendant's Combined Brief at 20, footnote 4.

**5.** Likewise, in *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), the Supreme Court held that New Orleans Ordinance 828 M.C.S. § 49–7 had a broader sweep

In *Collin v. Smith,* the Seventh Circuit demonstrated its understanding that the definition of fighting words now encompasses only words which tend to incite an immediate breach of the peace. The court stated that "[a] conviction for less than words that at least tend to incite an immediate breach of the peace cannot be justified under *Chaplinsky." See Collin* 578 F.2d at 1203 (citing *Gooding,* 405 U.S. at 524–27, 92 S.Ct. at 1107–09). The *Collin* court held that three Village of Skokie ordinances failed under the fighting words doctrine because the Village did not rely on a fear of responsive violence to justify the ordinance. *See id.*

In addition to limiting the scope of fighting words to words which tend to incite an immediate breach of the peace, the Supreme Court has also set forth a stringent definition of "breach of peace." In *Gooding,* the Court stated that § 26–6303 failed to meet the requirements of the fighting words doctrine because, among other things, the "appellate decisions construing the reach of 'tending to cause a breach of peace' underscore that § 26–6303 [was] not limited ... to words that 'naturally tend to provoke violent resentment.'" *See Gooding* at 525, 92 S.Ct. at 1107 (citations omitted). The Court noted that a Georgia Court of Appeals, in applying another statute, adopted the common law definition of "breach of peace."

"The term 'breach of peace' is generic, and includes all violations of the public peace or order or decorum; in other words, it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of the community.... By 'peace' as used in this connection, is meant the tranquility enjoyed by the citizens of a municipality or a community where good order reigns among its members."

*Id.* at 527, 92 S.Ct. at 1108 (quoting *Samuels v. State,* 103 Ga.App. 66, 67, 118 S.E.2d 231, 232 (1961)). The *Gooding* Court held that this definition of breach of peace sweeps too broadly. *See id.* Thus, in order to constitute fighting words, speech must not merely breach decorum but also must tend to bring the addressee to fisticuffs. *See Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989).

Finally, in *Cohen v. California,* the Supreme Court held that fighting words must be directed at the person of the addressee. 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In *Cohen,* the petitioner was convicted under California Penal Code § 415[6] for wearing a jacket bearing the words "Fuck the Draft" in the corridor of the Los Angeles Courthouse. The Court held that Mr. Cohen's conduct did not fall within the fighting words doctrine because his statement "was clearly not 'directed to the per-

---

than the definition of "fighting words." Section 49–7 provided:

> It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police in actual performance of his duty.

*See id.* at 132, 94 S.Ct. at 972. The Supreme Court previously remanded this case to the Louisiana Supreme Court for reconsideration in light of *Gooding. See id.* at 131, 94 S.Ct. at 971. The Louisiana Supreme Court did not "refine or narrow [the words of § 49–7], but took them as they stood: 'The proscriptions are narrow and specific—wantonly cursing, reviling, and using obscene or opprobrious language.'" *See id.* at 132, 94 S.Ct. at 972 (citations omitted). The Supreme Court found that "nothing in the opinion of the Louisiana Supreme Court ... [made] any meaningful attempt to limit or properly define—as limited by *Chaplinsky* and *Gooding*—

'opprobrious,' or indeed any other term in § 49–7." *See id.* at 133, 94 S.Ct. at 972.

More recently, in *Texas v. Johnson,* the Supreme Court held that the act of flag burning does not fall within the class of "fighting words" because it is unlikely to incite an immediate breach of the peace. 491 U.S. 397, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989).

> Nor does Johnson's expressive conduct fall within that class of "fighting words" that are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." No reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs.

*Id.* (citations omitted).

**6.** Section 415 prohibits "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person ... by ... offensive conduct...." *Id.* at 16.

son of the hearer.'" *See Cohen* at 20, 91 S.Ct. at 1785 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 309, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940)).

(b) APPLICATION OF THE FIGHTING WORDS DOCTRINE TO THE UW RULE.

■ As stated above, in order to be regulated by the rule which the UW has adopted, a comment, epithet or other expressive behavior must:

(1) be racist or discriminatory;

(2) be directed at an individual;

(3) demean the race, sex, religion, color, creed, disability, sexual orientation, national origin, ancestry or age of the individual; and

(4) create an intimidating, hostile or demeaning environment for education, university-related work, or other university-authorized activity.

Since the elements of the UW Rule do not require that the regulated speech, by its very utterance, tend to incite violent reaction, the rule goes beyond the present scope of the fighting words doctrine.

The first element of the UW Rule, which requires that the speech be racist or discriminatory, describes the content of the speech regulated but does not state that the speech must tend to cause a breach of the peace. The second element, which requires that the speech be directed at an individual, meets the requirement set forth in *Cohen* that the speech be "directed to the person of the hearer." In addition, the second element makes it likely that the rule will cover some speech which tends to incite violent reaction. Nevertheless, this element does not require that the regulated speech *always* tend to incite such reaction and is likely to allow the rule to apply to many situations where a breach of the peace is unlikely to occur.

The third element of the UW Rule requires that the regulated speech demean an individual's race, sex, religion, etc. This element addresses the concerns of the now defunct first half of the fighting words definition. Words which demean a person's race, sex, religion, etc. are likely to inflict injury and affect a person's sensibilities.[7] Nonetheless, the third element of the UW Rule does not address the concerns of the second half of the fighting words definition. Speech may demean an individual's characteristics without tending to incite that individual or others to an immediate breach of the peace.

The fourth element of the UW Rule requires that the prohibited speech create an intimidating, hostile or demeaning environment. An intimidating, hostile or demeaning environment certainly "disturb[s] the public peace or tranquility enjoyed by the citizens of [a university] community." However, it does not necessarily tend to incite violent reaction. The creation of a hostile environment may tend to incite an immediate breach of peace under some circumstances. Nevertheless, the term "hostile" covers non-violent as well as violent situations.[8] Moreover, an intimidating or demeaning environment is unlikely to incite violent reaction. To "intimidate" means to "make timid; threaten" or to "discourage or inhibit by or as if by threats." *See* The American Heritage Dictionary (2nd College Ed.1976), p. 672. To "demean" is to "debase in dignity or stature." *See id.* at 376. Given these definitions of "intimidate" and "demean," this Court cannot properly find that an intimidating or demeaning environ-

---

**7.** The Board notes that discriminatory harassment has harmful effects on its victims. "The negative effects of hate messages are real and immediate for the victims." 87 Mich.Law Rev. 2320. Studies show that victims of discriminatory harassment have experienced physiological symptoms and emotional distress ranging from fear, rapid pulse rate, difficulty in breathing, nightmares, post-traumatic stress disorder, hypertension, psychosis and suicide. *Id.*

The injuries to victims of discriminatory harassment demonstrate the high costs to socie-

ty which such speech imposes. However, as stated above, the Supreme Court has determined that speech does not lose its protected status merely because it inflicts injury or disgrace onto its addressees.

**8.** The American Heritage Dictionary defines the adjective "hostile" as: "(1) of or pertaining to an enemy. (2) Feeling or showing enmity; antagonistic. (3) Not hospitable." These definitions of hostile are likely to cover speech which does not invite violent response.

ment tends to incite an immediate breach of the peace.

The Board of Regents argues, nonetheless, that it is "understandable to expect a violent response to discriminatory harassment, because such harassment demeans an immutable characteristic which is central to the person's identity." *See* Defendant's Combined Brief, p. 27. The Board states that "the victim will feel compelled to respond, not just for his own dignity, but for the dignity of his brothers and sisters of like color, national origin or creed." *See id.* The Board asserts, for example, that calling a black student a "God damn nigger" is very likely to provoke a violent response. *See id.*

While the Board is correct that the language regulated by the UW Rule is likely to cause violent responses in many cases, the rule regulates discriminatory speech whether or not it is likely to provoke such a response. It is unlikely that all or nearly all demeaning, discriminatory comments, epithets or other expressive behavior which creates an intimidating, hostile or demeaning environment tends to provoke a violent response. Since the UW Rule covers a substantial number of situations where no breach of the peace is likely to result, the rule fails to meet the requirements of the fighting words doctrine.

(2) WHETHER THE BALANCING TEST SET FORTH IN *CHAPLINSKY LEAVES THE SPEECH REGULATED BY THE UW RULE UNPROTECTED.*

■ The Board of Regents next argues that the UW Rule is in harmony with the First Amendment because it only regulates speech with minimum social value and which has harmful effects. The Board asserts that this balancing approach is consistent with the Supreme Court's holding in *Chaplinsky.* In support of this assertion, the Board notes that while the *Chaplinsky* Court created a *per se* rule with respect to fighting words, it used a balancing approach to reach this result. *See* Defendant's Combined Brief at 19–20 (citing Rutzick, "Offensive Language and the Evolution of First Amendment Protection," 9 Harv.C.R.—C.L.L.Rev. 1, 2 (1974)).

The Board apparently believes that the Supreme Court referred to its balancing approach when it stated:

"It has been well observed that ["fighting words"] are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

*See Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. The Board is correct that the *Chaplinsky* Court employed a balancing approach to determine that "certain well-defined and narrowly limited classes of speech," such as fighting words, do not deserve First Amendment protection. However, the *Chaplinsky* Court did not state that lower courts should employ a balancing approach to identify additional categories of speech undeserving of protection.

Moreover, the Seventh Circuit has stated that a balancing approach is appropriate only for content-neutral speech regulation. *See American Bookseller Ass'n, Inc. v. Hudnut,* 771 F.2d 323 (7th Cir.1985). In *American Booksellers,* the Seventh Circuit stated: "The Court sometimes balances the value of speech against the costs of its restriction, but it does this by category of speech and not by the content of particular works." *See id.* at 331–332. In support of this assertion, the *American Booksellers* court cited John Hart Ely, "Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis," 88 Harv.L.Rev. 1482 (1975), and Geoffrey R. Stone, "Restrictions of Speech Because of its Content: The Peculiar Case of Subject–Matter Restrictions," 46 U.Chi. L.Rev. 81 (1978).

Professor Stone's article identifies two categories of governmental restrictions of expression: content-neutral restrictions and content-based restrictions. Professor Stone defined content-neutral restrictions as those which "restrict communication without regard to the message conveyed." *See id.* at 81. Examples of these restrictions include "[l]aws prohibiting noisy speeches near a hospital, banning the erection of any billboards in residential commu-

nities, or requiring disclosure of the names of leafletteers." *Id.* "In judging the constitutionality of such restrictions, the Supreme Court engages in a balancing of first amendment interests against competing government concerns." *Id.*

Content-based restrictions, on the other hand, "restrict communication because of the message conveyed." *Id.* Professor Stone listed as examples of these types of restrictions "[l]aws prohibiting the publication of specific types of 'confidential' information, forbidding the hiring of teachers who advocate violent overthrow of the government, or banning the display of the swastika in certain neighborhoods." *Id.* The Supreme Court has been especially wary of this sort of regulation and has upheld content-based restrictions of speech only when they fall within one of the well-defined, narrow classes of unprotected speech. As Professor Stone noted:

> The Court has, to be sure, permitted content-based restrictions when the speech at issue has fallen within one of those special and limited categories of expression, such as obscenity, false statements of fact, or fighting words, that the Court has found to be of such low value in terms of the historical, philosophical, and political purposes of the amendment as to be entitled to less than full Constitutional protection. Outside this "low value" realm, however, the Court has embraced a stringently speech-protective set of standards, sustaining content-based restrictions of "fully protected" expression in only the most extraordinary circumstances.

*Id.* at 82 (footnotes omitted).

Given the *American Booksellers* court's clear statement [9] and its reference to Professor Stone's article, it is evident that this Court may employ a balancing approach to determine the constitutionality of the UW Rule only if it is content neutral. It is clear, however, that the UW Rule regulates speech based on its content. The rule disciplines students whose comments, epithets or other expressive behavior demeans their addressees' race, sex, religion, etc. *See* UW Rule § 2(a)(1). However, the rule leaves unregulated comments, epithets and other expressive behavior which affirms or does not address an individual's race, sex, religion, etc.

Since the UW Rule regulates speech based upon its content, it is not proper for this Court to apply a balancing test to determine the constitutionality of the rule. Moreover, this Court finds that, even under the balancing test proposed by the Board of Regents, the rule is unconstitutional.

(a) BENEFITS SIDE OF BALANCING TEST

On the benefits side of its proposed balancing test, the Board of Regents argues that the discriminatory speech proscribed by the UW Rule has little or no social value since it does not serve as a "step to the truth." The Board states that the proscribed speech lacks social utility because it: (1) is not intended to inform or convince the listener; (2) is not likely to form any part of a dialogue or exchange of views; (3) does not provide an opportunity for reply; (4) constitutes a kind of verbal assault on the person to whom it is directed and (5) is likely to incite reaction.

The Board first asserts that the speech proscribed by the UW Rule is not intended

---

**9.** The *American Booksellers* court's reluctance to apply a balancing approach to content-based restrictions is well founded. The First Amendment's protection of speech constitutes a pre-commitment by the government to refrain from restricting the expression of ideas. This pre-commitment ensures the "continued building of our politics and culture" as well as "self-fulfillment for each individual."

This commitment to free expression must be unwavering, because there exist many situations where, in the short run, it appears advantageous to limit speech to solve pressing social prob-

lems, such as discriminatory harassment. If a balancing approach is applied, these pressing and tangible short run concerns are likely to outweigh the more amorphous and long run benefits of free speech. However, the suppression of speech, even where the speech's content appears to have little value and great costs, amounts to governmental thought control. An individual instance of thought control may not appear to impose great costs on society. However, if a balancing test is used there are likely to be many such instances. Taken as a whole, these instances will work to dissolve the great benefits which free speech affords.

to inform or convince its listener. The Court disagrees with this assertion. Most students punished under the rule are likely to have employed comments, epithets or other expressive behavior to inform their listeners of their racist or discriminatory views. In addition, nothing in the UW Rule prevents it from regulating speech which is intended to convince the listener of the speaker's discriminatory position. Accordingly, the rule may cover a substantial number of situations where students are attempting to convince their listeners of their positions.[10]

Moreover, even if the UW Rule did not regulate speech intended to inform or convince the listener, the speech the rule prohibits would be protected for its expression of the speaker's emotions. The Supreme Court has held that the Constitution protects speech for its emotive function as well as its cognitive content. *See Cohen,* 403 U.S. at 26, 91 S.Ct. at 1788. "We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." *Id.* Most, if not all, of the cases covered by the UW Rule are likely to involve speech which expresses the speaker's feelings regarding persons of a different race, sex, religion, etc.

The Board next asserts that the regulated speech lacks First Amendment value because it is unlikely to form any part of a dialogue or exchange of views and because it does not provide an opportunity for a reply. In *American Booksellers,* the Seventh Circuit addressed and rejected these arguments.

> Much of [defendant's] argument rests on the belief that when speech is "unanswerable," and the metaphor that there is a "marketplace of ideas" does not apply, the First Amendment does not apply

either. The metaphor is time honored; Milton's *Aeropagitica* and John Stewart Mill's *On Liberty* defend freedom of speech on the ground that the truth will prevail, and many of the most important cases under the First Amendment recite this position. The Framers undoubtedly believed it. As a general matter it is true. But the Constitution does not make the dominance of truth a necessary condition of freedom of speech. To say that it does would be to confuse an outcome of free speech with a necessary condition for the application of the amendment.

*American Booksellers* at 330; *see also Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

Thirdly, the Board states that the prohibited speech constitutes a kind of verbal assault on the addressee. However, the Supreme Court has already performed a balancing test with respect to speech which inflicts injury and has found it to be worthy of First Amendment protection. Accordingly, it would be improper for this Court to find the speech regulated by the UW Rule unprotected based upon its assaultive characteristics.

Finally, the Board argues that the prohibited discriminatory speech lacks First Amendment value because of its tendency to incite reaction. While the Board is correct that the discriminatory speech prohibited by the UW Rule may in many circumstances tend to incite violent reaction, the rule prohibits speech regardless of its tendency to do this. *See supra* at 1173. The Supreme Court has clearly defined the category of speech which is unprotected due to its tendency to incite violent reaction. This category of speech is limited to speech which by its very utterance tends to incite an immediate breach of the peace. It would be improper for this Court to expand the Supreme Court's definition of fighting words to include speech which does and speech which does not tend to incite violent reaction.

---

**10.** For example, it is likely that the University of Wisconsin—Oshkosh student disciplined for his comments to an Asian–American student wished to convince his listener that he did not belong in America. *See supra,* p. 8.

(b) Costs Side of Balancing Test

On the costs side of the balance, the Board of Regents asserts that speech regulated under the UW Rule inflicts great harm since it prevents the universities from meeting several "compelling interests": (1) increasing minority representation; (2) assuring equal educational opportunities; (3) preventing interruption of educational activities; and (4) preserving an orderly and safe campus environment. Each of these asserted compelling interests has substantial difficulties. Accordingly, the costs side, like the benefits side, of the Board's balancing equation fails to support the constitutionality of the UW Rule.

The Board's first asserted compelling interest is increasing minority representation to add to the diversity of University of Wisconsin System campuses. Increasing diversity is "clearly a constitutionally permissible goal for an institution of higher education." *University of California Regents v. Bakke*, 438 U.S. 265, 311–312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978). However, the UW Rule does as much to hurt diversity on Wisconsin campuses as it does to help it. By establishing content-based restrictions on speech, the rule limits the diversity of ideas among students and thereby prevents the "robust exchange of ideas" which intellectually diverse campuses provide. *See id.* at 313, 98 S.Ct. at 2760.

The Board's second asserted compelling interest is the provision of equal educational opportunities in accordance with the Fourteenth Amendment. The Board notes that the Supreme Court has stated: "The opportunity for an education, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *See Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). However, the Board of Regents presents no evidence that it is not already providing education on equal terms. Any inequality in educational opportunities addressed by the UW Rule is due to the discriminatory activity of students, not University of Wisconsin System employees. Since students are generally not state actors, the Board's Fourteenth Amendment equal protection argument is inapplicable to this case.

The Board's third asserted compelling interest is preventing interruption of educational activities. In support of this assertion, the Board cites a series of Supreme Court cases which permit schools to control the activities of students which interfere with the opportunity of other students to obtain an education. *See Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). However, these cases allow time, place and manner restrictions on speech, not restrictions based upon the speech's content. *See Tinker* 393 U.S. at 513, 89 S.Ct. at 740 ("conduct by the student, in class or out of it, which for any reason—whether it stems from *time, place or type of behavior*—materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech" (emphasis added and citation omitted)).

Moreover, the Board's argument under this asserted compelling interest is inconsistent with the limits of the fighting words doctrine. In its briefs, the Board has argued that the UW Rule does not cover speech within the classroom. *See, e.g.,* Defendant's Combined Brief at 43. Accordingly, it has been forced to argue that discriminatory speech interrupts educational opportunities because of its negative psychological effects on students. However, this argument is inconsistent with the fighting words doctrine which leaves protected words which inflict injury.

Finally, the Board asserts that it has a compelling interest in maintaining safety and order on its campuses. In support of this assertion, the Board again argues that speech regulated by the UW Rule is likely to provoke violent reaction. However, as stated above, a substantial portion of the speech regulated by the rule is not likely to provoke such a reaction. Accordingly, this

Court must find that the Boards' final proposed interest is not compelling.

Because the UW Rule fails under both the fighting words doctrine and the UW System's proposed balancing test, this Court must find the rule overbroad and therefore in violation of the First Amendment.

### (3) PARALLEL TO TITLE VII LAW

■ The Board of Regents argues that this Court should find the UW Rule constitutional because its prohibition of discriminatory speech which creates a hostile environment has parallels in the employment setting. The Board notes that, under Title VII, an employer has a duty to take appropriate corrective action when it learns of pervasive illegal harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986).

The Board correctly states Title VII law. However, its argument regarding Title VII law has at least three difficulties. First, Title VII addresses employment, not educational, settings. Second, even if Title VII governed educational settings, the *Meritor* holding would not apply to this case. The *Meritor* Court held that courts should look to agency principles when determining whether an employer is to be held liable for its employee's actions. *See id.* Since employees may act as their employer's agents, agency law may hold an employer liable for its employees actions. In contrast, agency theory would generally not hold a school liable for its students' actions since students normally are not agents of the school. Finally, even if the legal duties set forth in *Meritor* applied to this case, they would not make the UW Rule constitutional. Since Title VII is only a statute, it

cannot supersede the requirements of the First Amendment.

### (4) THE BOARD'S PROPOSED LIMITING CONSTRUCTION

■ The Board of Regents requests that this Court apply a limiting construction to the UW Rule if it finds the rule overbroad as written. The Board states that "[t]he Court [may] hold, if necessary, that the Rule is constitutional to the extent that it sanctions discriminatory epithets, insults and personally abusive comments but unconstitutional to the extent that it may be applied to discriminatory opinions [with some intellectual basis[11]]." *See* Defendant's Reply Brief at 7.

Plaintiffs argue that this Court must decline the Board's invitation to interpret the UW Rule. In support of this assertion, plaintiffs cite *Boos v. Barry*, 485 U.S. 312, 330, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333 (1988). The *Boos* Court cited *Grayned v. Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972) and *Gooding*, 405 U.S. at 520–521, 92 S.Ct. at 1105 (1972) for the proposition that "federal courts are without power to adopt a narrowing construction to a state statute unless such a construction is reasonable and readily apparent." *See Boos*, 485 U.S. at 330, 108 S.Ct. at 1168.

This Court finds that the *Boos* decision does not prevent the Court from adopting the limiting construction offered by the Board of Regents. The Board's proposed construction is reasonable and readily apparent since the guide circulated with the UW Rule indicates that the expression of discriminatory opinions and ideas is not prohibited by the Rule. *See* Discriminatory Harassment: Prohibited Conduct Under Chapter UWS 17 Revisions, Questions 1 and 5.

---

11. Presumedly, the Board's proposed limitation is intended to remove only discriminatory opinions with intellectual bases from the reach of the UW Rule. The term "opinion" means "[a] belief or conclusion held with confidence, but not substantiated by positive knowledge or proof." *See* The American Heritage Dictionary, p. 872. This definition of opinion would appear to reach all beliefs or conclusions, regardless of their intellectual bases. However, if this definition of opinion is used in the Board's limiting

construction, the construction swallows the rule. The comment "you're just a dumb black, woman or homosexual" and the epithets "nigger," "bitch," and "fag" all express a speaker's opinion regarding a characteristic of his or her addressee. Yet this comment and these epithets are among the most base speech addressed by the UW Rule. Accordingly, unless the Board's proposed limitation on the Rule is confined to opinions with some intellectual basis, the limitation will defeat the rule.

This Court, nonetheless, refuses to adopt the limiting construction offered by the Board of Regents since that construction fails to solve the UW Rule's overbreadth difficulties. The Board's construction does not prevent the Rule from reaching a substantial amount of speech outside the traditional definition of fighting words. Under the proposed construction, student speech violates the UW Rule if it: (1) is discriminatory; (2) is directed at an individual; (3) demeans the race, sex, religion, etc. of that person; (4) creates an intimidating, hostile or demeaning environment and (5) lacks an intellectual basis. As stated above, the first four elements do not ensure that the rule covers only speech which tends to incite violent reaction. *See supra,* pp. 1172–1173. Likewise, the fifth requirement does not prevent the rule from reaching protected speech. Much speech which meets the first four elements of the UW Rule and lacks intellectual support is unlikely to cause an immediate breach of the peace. For example, the comment "you're just a dumb black, woman, or homosexual," does not necessarily tend to incite violent reaction even if it demeans the addressee and creates an intimidating, hostile or demeaning environment.

In addition, the proposed limiting construction does not solve the UW Rule's difficulties under the Board's proposed balancing test. The proposed construction fails to aid the Board's arguments with respect to the benefits side of the balancing test. The construction may reduce the number of situations where the rule is applied to speech which is intended to inform or convince the listener. However, as stated above, the First Amendment protects speech for its emotive function even if it lacks cognitive value. The construction may also tend to limit the reach of the rule to speech which is unanswerable and constitutes a verbal assault on the person addressed. Nonetheless, as mentioned to above, these considerations do not affect the protected status of speech. Finally, the limiting construction may increase the probability that the rule will be applied where a student's speech tends to cause an immediate breach of the peace. Neverthe-

less, as stated above, the rule will still cover many situations in which there is little likelihood of violent reaction.

The Board's limiting construction also fails to make persuasive their arguments with respect to the harms side of the balancing test. The construction will ensure that the rule does not limit the diversity of opinions on University of Wisconsin System campuses which have intellectual bases. However, the First Amendment protects speech regardless of its intellectual support. *See Collin* at 1203 ("[u]nder the First Amendment there is no such thing as a false idea" (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974)).

The limiting construction also fails to aid the Board's equal protection argument since even under the proposed construction, the UW Rule does not address discrimination caused by state actors. The construction also does little to help the Board's argument based on its interest in preventing interruption of educational opportunities since: (1) even under the limiting construction, the rule amounts to more than a time, place and manner restriction on speech and (2) as stated above, the Board's basis for this argument is inconsistent with the fighting words doctrine. Finally, the limiting construction fails to make the Board's interest in preserving orderly and safe campuses a compelling one. As stated above, even under the construction, the UW Rule will cover much speech which does not tend to incite an immediate breach of the peace.

### B. VAGUENESS

A statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973). A statute must give adequate warning of the conduct which is to be prohibited and must set out explicit standards for those who apply it. *Id.* These concerns apply with particular force where the challenged statute affects First Amendment rights. *Village of Hoffmann Estates v. The Flipside, Hoffmann Estates, Inc.,* 455 U.S. 489,

499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Nonetheless, the chilling effect caused by an overly broad statute must be real and substantial and a narrowing construction must be unavailable before a court will set it aside. *See Young v. American Mini Theaters*, 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976).

In our case, plaintiffs argue that the UW Rule is unconstitutionally vague for two reasons: (1) the phrase "discriminatory comments, epithets or other expressive behavior" and the term "demean" are unduly vague and (2) the rule does not make clear whether the prohibited speech must actually create a hostile educational environment or whether speaker must merely intend to create such an environment. Upon review, it appears that the phrase and term referred to by plaintiff are not unduly vague. However, the rule is ambiguous since it fails to make clear whether the speaker must actually create a hostile educational environment or if he must merely intend to do so.

### (1) "Discriminatory Comments, Epithets and Abusive Language" and "Demean"

■ Plaintiffs first argue that the phrase "discriminatory comments, epithets or other expressive behavior" is unduly vague. In determining the clarity of this phrase, it is helpful first to examine the definitions of its key terms. The term "discriminatory" means "[m]arked by or showing prejudice; biased." *See* The American Heritage Dictionary, p. 404. "Comment" as used in the Rule, means "[a] brief statement of fact or opinion, esp. a remark that expresses a personal reaction or attitude: *made a comment on the governor's speech.*" *See id.*, p. 297 (emphasis in original). "Epithet" is "[a] term used to characterize a person or thing," "[a] term used as a descriptive substitute for the name or title of a person," or "[a]n abusive or contemptuous word or phrase." *See id.*, p. 460. "Expressive" means "[s]erving to express or indicate."

These key terms appear to have reasonably clear meanings in the context of the phrase "discriminatory comments, epithets or expressive behavior." Plaintiff argues, however, that the mere recitation of dictionary definitions does not show that the rule is reasonably clear since every word has a definition. Plaintiff's argument would have force if the definitions of the key terms were ambiguous in the context of the phrase in question or the UW Rule. However, the meanings of the terms appear clear and definite in the context of the phrase and the rule.

Plaintiffs also argue that the phrase is vague based upon the University of Wisconsin—Parkside's failure to apply the UW Rule after a student called another a "redneck." A University of Wisconsin—Parkside Associate Dean, Roger Howard, found that "it would be very difficult to show that the term "redneck" is by itself the equivalent of a discriminatory epithet." *See* Kassell Aff.Ex. 17.

It appears that Mr. Howard misapplied the phrase "discriminatory comments, epithets or other expressive behavior." The Random House Dictionary defines "redneck" as a "disparaging" name for "an uneducated white farm laborer." *See* Random House Dictionary of the English Language (unabridged ed. 1986), p. 1203. In addition, The American Heritage Dictionary describes "redneck" as:

> *Slang.* A member of the white rural laboring class, esp. in the southern United States. 2. *Offensive Slang.* A person who advocates a provincial, conservative, often bigoted sociopolitical attitude considered characteristic of a redneck.

*See* The American Heritage Dictionary, p. 1037 (emphasis in original). Given these definitions of "redneck," Mr. Howard probably should have found the student's use of the term constituted a discriminatory epithet. However, this single improper application of a portion of the UW Rule does not make the rule vague. Thus, given the clear dictionary definitions of the key terms in the phrase "discriminatory comments, epithets and other expressive behavior," this Court finds that the phrase does not have vagueness difficulties.

Plaintiffs next argue that the term "demean" is unduly vague. As stated above

to demean means to debase in dignity or stature. Thus, a student's speech can violate the UW Rule only if it debases the race, sex, religion, etc. of the addressee. This requirement appears reasonably clear and therefore should provide adequate warning of the conduct prohibited by the UW Rule and should set forth explicit standards for those who apply it.

Plaintiffs argue, however, that the requirement of an intent to "demean" presents vagueness problems because it causes discriminatory comments, epithets or other expressive behavior to violate the rule in one context and not in another. To demonstrate this "problem," plaintiff cites the application of the UW Rule at the University of Wisconsin—Stout and the nonapplication of the rule at the University of Wisconsin—Whitewater. The University of Wisconsin—Stout applied the rule where a student called another a "nigger" during an altercation. *See* Kassel Aff., Ex. 23, p. 2.[12] In contrast, the University of Wisconsin—Whitewater found that a white student had not violated the UW Rule where he called a black student "nigger" as part of a verbal exchange which led to a physical confrontation,. *See id.*, Ex. 25. The University explained that there was no violation because:

> [The student charged] was raised in a racially mixed neighborhood in Chicago. It was common for both blacks and whites in this environment to refer to blacks who were not respected, liked or appreciated as "nigger." As [the student] stated, "it's like calling someone an ass or names like that.["] [The student addressed] agreed and stated that this kind of language/name calling exists in his neighborhood as well. [He] also stated that he did not think [the] intent [of the student charged] was to demean him personally or racially.

*Id.*

Although different results were reached in the above cases, those results were not inconsistent. In the first case, the University of Wisconsin—Stout found that the student's comments demeaned his addressee on the basis of her race. *See* Kassel Aff., Ex. 23, p. 3. In contrast, the University of Wisconsin—Whitewater reasonably found that the student charged did not demean the race of his addressee.

The differing results in the two cases were not due to any vagueness in the term "demean." Rather, they arose from the high standard of proof required by § 2(a)(1) of the UW Rule. Since the rule requires that a student must intentionally demean his or her addressee's race, sex, religion, etc. in order to violate the rule, it is likely that the rule is inapplicable in many instances where students use discriminatory language.

Thus, the phrase "discriminatory comments, epithets and expressive behavior" and the term "demean" do not appear to have vagueness difficulties. Nonetheless, as stated above, these terms fail to solve the UW Rule's overbreadth difficulties. The rule clearly reaches beyond the narrow confines of the fighting words doctrine. Although the above terms give students adequate notice of the speech which the rule prohibits and provides explicit standards for those who apply the rule, the terms nevertheless allow the rule to prohibit protected speech.

### (2) Ambiguity

■ The Court concurs with plaintiffs that the UW Rule is unduly vague because it is ambiguous as to whether the regulated speech must actually demean the listener and create an intimidating, hostile or demeaning environment for education or whether the speaker must merely intend to demean the listener and create such an environment. As plaintiffs note, the rule itself suggests that prohibited speech must actually demean the addressee and create an intimidating, hostile or demeaning environment. *See* UW Rule § 2(a). However, the illustrative examples published with the rule in the Wisconsin Administrative Code suggest that there is no need to prove that

---

**12.** The student actually called his addressee a "piece of shit nigger" and later stated "fuck you nigger." *See id.*

a student's speech had any effect on the listener or the educational environment. *See* UWS 17.06–(2)(c). In addition, the UW–Milwaukee has interpreted the rule to require only the intent to demean or to create a hostile environment. *See* Kassel Aff., Ex. 31.

This Court could correct this ambiguity in the UW Rule by interpreting it to require either: (1) the intent to demean the listener and to create an intimidating, hostile or demeaning educational environment or (2) the intent to and effect of demeaning the listener and creating such an environment. However, neither interpretation of the UW Rule saves the rule from its overbreadth difficulties. Accordingly, this Court will not interpret section (2)(a) of the rule.

### III. CONCLUSION

The founding fathers of this nation produced a remarkable document in the Constitution but it was ratified only with the promise of the Bill of Rights. The First Amendment is central to our concept of freedom. The God-given "unalienable rights" that the infant nation rallied to in the Declaration of Independence can be preserved only if their application is rigorously analyzed.

The problems of bigotry and discrimination sought to be addressed here are real and truly corrosive of the educational environment. But freedom of speech is almost absolute in our land and the only restriction the fighting words doctrine can abide is that based on the fear of violent reaction. Content-based prohibitions such as that in the UW Rule, however well intended, simply cannot survive the screening which our Constitution demands.

Based on the above, this Court GRANTS plaintiffs' motion for summary judgment and DENIES the Board of Regents' motion for summary judgment. Accordingly, this Court ORDERS: (1) that a declaratory judgment be entered that the UW Rule on its face violates the overbreadth doctrine and is unduly vague; (2) that the Board of Regents and its agents and employees are permanently enjoined from enforcing the UW Rule and (3) that the Board of Regents is required to vacate the disciplinary action taken against plaintiff John Doe under the UW Rule and to expunge from his file all records related to that action.

The Court requests that the parties submit briefing on plaintiffs' request for reasonable attorneys' fees and costs. Plaintiffs should submit its brief and affidavits within twenty (20) days of the entering of this *Decision and Order.* The UW System shall have an additional ten (10) days to file a response and plaintiffs another seven (7) days to file a reply.

SO ORDERED.